(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HUNTER *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–1063.  Argued March 3, 2026—Decided June 18, 2026

Petitioner Munson Hunter III was charged with 10 counts of bank and wire fraud for a years-long scheme costing various financial institutions about half a million dollars.  He entered into a written plea agreement with the Government under which he pleaded guilty to one count of aiding and abetting wire fraud in exchange for dismissal of the remaining nine charges and a promise not to prosecute him for the described conduct in the future.  The agreement included an appeal waiver under which Hunter waived the right to appeal his conviction and sentence, except that he did not waive the right to raise a claim of ineffective assistance of counsel.  The agreement further provided that "any modification" of its terms "must be in writing and signed by all parties."  The District Court accepted the plea after deeming it knowing and voluntary.

At sentencing, the Probation Office recommended that as a condition of supervised release Hunter be required to participate in a mental-health treatment program and take all mental-health medications prescribed by his treating physician.  Hunter objected to the mandatory-medication part of that condition.  The District Court told Hunter that if "the treatment provider prescribes drugs, you should take them," while also telling Hunter that he could "address" any future dispute about medication "to the probation officer" or, if needed, "to me."  The District Court then imposed a sentence of 51 months in prison followed by three years of supervised release, including the contested medication condition.  At the close of the hearing, the court told Hunter: "All right.  You have a right to appeal.  If you wish to appeal, [your trial counsel] will continue to represent you."  When asked if either party wished to say anything else, Hunter's lawyer said "Nothing from the defense," and the prosecutor replied: "Your Honor, I believe—well, no.

I—no."

Hunter appealed, challenging the mandatory-medication condition as infringing on his "fundamental due process liberty interest in being free of unwanted mental health medication." The Government sought dismissal based on the appeal waiver. Hunter acknowledged he had knowingly and voluntarily signed the waiver but argued that an appeal waiver is unenforceable when the disputed aspect of a sentence violates a fundamental constitutional right, and alternatively that the District Court's statement at sentencing about appeal rights, along with the prosecutor's failure to object, voided the waiver. The Court of Appeals for the Fifth Circuit dismissed the appeal, holding that the District Court's misstatement "did not impact the validity of the appeal waiver" and that under Circuit precedent the "general rule" that appeal waivers are enforceable has only two exceptions: when the waiver was tainted by ineffective assistance of counsel and when the sentence exceeded the statutory maximum. Because neither exception applied, the Fifth Circuit held that Hunter's appeal could not go forward.

*Held*: An agreement not to appeal a sentence is unenforceable when it would result in a miscarriage of justice—meaning, when it would leave in place the kind of egregious error that would bring the judicial system into disrepute. Pp. 5–14.

(a) The District Court's misstatement at sentencing and the Government's silence did not negate Hunter's knowing and voluntary appeal waiver. The plea agreement specified that "[a]ny modification" of its terms "must be in writing and signed by all parties," and even assuming away that provision, nothing that happened in the sentencing hearing shows the mutual agreement between parties needed to accomplish a modification. The court's statement about appeal rights could not change the parties' agreement because it is the parties' intent that matters, and their non-response falls far short of showing agreement to alter a conflicting term.

The Government did not waive or forfeit its right to enforce the appeal waiver by failing to correct the court's misstatement. Under ordinary litigation principles, waiver requires some affirmative signal of abandonment, and staying silent—as here, not picking a fight—does not qualify. Forfeiture generally does happen through silence because it is the failure to make the timely assertion of a right, but the proper time for the Government to assert its right to enforce an appeal waiver is after a defendant files a notice of appeal, not at sentencing. The decision that Hunter's appeal waiver remains valid matches one the Court reached in a nearly mirror-image case, *Class* v. *United States*, 583 U. S. 174. Pp. 5–7.

(b) The question becomes whether the Government's right to enforce an appeal waiver has limits and, if so, what they are. It is common

Syllabus

ground that an appeal waiver must be knowing and voluntary to be valid and thus to be enforceable, and that an appeal waiver is not knowing and voluntary if it was the product of ineffective assistance of counsel. Putting that to the side, the Fifth Circuit holds appeal waivers unenforceable only when the sentence exceeds the statutory maximum. The Government maintains that knowing and voluntary appeal waivers are always enforceable. But most courts of appeals have instead taken a less stringent approach, declining to enforce appeal waivers when doing so would produce a "miscarriage of justice." The question for the Court is which position is right.

The answer stems from the special, and indeed pivotal, role of the judiciary in approving and implementing appeal waivers. A district court must accept the plea agreement, including any appeal waiver, before it can go into effect, and that decision is one given over to "sound judicial discretion." *Santobello* v. *New York*, 404 U. S. 257, 261–262. An appeal waiver then falls into the lap of a court of appeals, which has exclusive control over its operation; the real-world effect of a waiver turns only on whether the appeals court decides to enforce it, and enforcement will cement into place a district court's sentence whether or not lawful. Because that is so, the standard for enforcing appeal waivers implicates the interests not only of the plea agreement's parties, but also of the judiciary. If a court always enforces appeal waivers regardless of the kind or degree of error tainting a sentence, the judicial system's integrity may come into question. The Court has recognized when addressing waivers of other rights held by criminal defendants that federal courts have an "independent" "institutional interest" in ensuring that legal proceedings "appear fair to all who observe them," *Wheat* v. *United States*, 486 U. S. 153, 160, and that some rules may be "so fundamental" that they could not be waived "without irreparably discrediting the federal courts," *United States* v. *Mezzanatto*, 513 U. S. 196, 204. Whatever the parties have agreed to, the court's own responsibility when enforcing a waiver is apparent, and so automatic enforcement may "risk[ ] institutional harm." *Id.*, at 205.

Accordingly, neither the Government's nor the Fifth Circuit's proposed rule can be the right one. The Government's position first runs into the scenario that even the Fifth Circuit will not tolerate: when a judge imposes a sentence beyond what the relevant statute allows. Suppose a judge sentences a misdemeanant to life in prison, when the applicable law caps a prison term at one year; if an appellate court had to dismiss the resulting appeal, it would call into doubt the judicial system's very attachment to law. But so too would a dismissal in certain other situations, which fall outside both the Government's and the Fifth Circuit's rules—for example, if the sentencing judge

unconstitutionally considered race or religion, imposed a condition that a defendant not become pregnant, or "let an orangutan pick a sentence out of a hat." Tr. of Oral Arg. 66. However certain the parties' agreement, the courts are too enmeshed in its approval and implementation to escape responsibility for such results. Pp. 7–11.

(c) The Court thus approves the majority view among the courts of appeals that an appeal waiver is unenforceable when it would result in a miscarriage of justice. The miscarriage-of-justice standard sets a high bar. The waiver may be set aside only if the sentence is marred by the kind of egregious error that would bring the judicial system into disrepute. The error must be obvious—not one a judge could reasonably make—and must be of the type that would undermine public confidence in the judiciary. Standard-fare errors in misapplying sentencing law cannot cancel an appeal waiver. But a high bar is not the same as an insurmountable one; the miscarriage-of-justice limit, as many appellate courts have properly applied it, offers a safety valve for extreme cases when the justice system's basic integrity is at stake.

The nature of the miscarriage-of-justice limit precludes any attempt to list all the situations in which it will overcome an appeal waiver. But a few examples of the kinds of errors that would bring the judiciary into disrepute may provide guidance to lower courts: a sentence exceeding what the relevant statute allows; a sentence infected with a blatant constitutional error, such as when a judge takes account of a constitutionally impermissible factor (like race) or imposes a constitutionally infirm condition of supervised release; and a sentence imposed without some minimum of civilized procedure. These examples are just examples, not intended to be exclusive, but they serve to illustrate the high bar a defendant must surmount to overcome an appeal waiver.

The Court doubts that this confined exception will "open the floodgates" to "waived appeals." Tr. of Oral Arg. 60, 87. Many Circuits already apply a miscarriage-of-justice limit, and the Government has offered no evidence those courts are awash with appeals. The Circuits using this approach have understood it to erect a substantial barrier, and such a hard-to-meet standard presumably deters many appeals while those still filed can often be quickly dismissed because the errors asserted are uncertain or ordinary. Pp. 11–13.

(d) The Court declines to decide in the first instance whether Hunter's challenge to the mandatory-medication condition satisfies the miscarriage-of-justice standard. The Court of Appeals did not address the question, and this Court is "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7. It is therefore up to the Fifth Circuit to decide whether enforcing Hunter's appeal waiver would result in a miscarriage of justice. Pp. 13–14.

Syllabus

Vacated and remanded.

    KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, GORSUCH, KAVANAUGH, BARRETT, and JACKSON, JJ., joined. GORSUCH, J., filed a concurring opinion, in which SOTOMAYOR and JACKSON, JJ., joined. KAVANAUGH, J., filed a concurring opinion, in which ALITO and BARRETT, JJ., joined. BARRETT, J., filed a concurring opinion. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 24–1063

———

## MUNSON P. HUNTER, III, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2026]

JUSTICE KAGAN delivered the opinion of the Court.

Plea agreements between a criminal defendant and the Government often include an appeal waiver—a promise by the defendant not to appeal his conviction or eventual sentence. In this case, we address a dispute about when such a promise is unenforceable in the sentencing context. We principally hold that an agreement not to appeal a sentence is unenforceable when it would result in a miscarriage of justice—meaning, when it would leave in place the kind of egregious error that would bring the judicial system into disrepute.

I

Petitioner Munson Hunter III entered into a written plea agreement with the Government after he was charged with ten counts of bank and wire fraud for a years-long scheme costing various financial institutions about half a million dollars. Under the agreement, Hunter pleaded guilty to one count of aiding and abetting wire fraud. In exchange, the Government agreed to dismiss the other nine charges and to refrain from prosecuting Hunter in the future for the conduct they described.

The agreement also included an appeal waiver, applying to both Hunter's conviction and his still-to-be-decided sentence. Under that provision, Hunter "knowingly and voluntarily waive[d] the right to appeal" his conviction and sentence, except that he did "not waive the right to raise a claim of ineffective assistance of counsel." App. to Pet. for Cert. 6a. And with specific reference to his sentence, Hunter acknowledged his "aware[ness]" of certain facts: that the sentence had "not yet been determined" by the District Court; that the Government had made no "promise or representation" about that sentence; and that the "sentence to be imposed [was] within the sole discretion of the sentencing judge." *Id.*, at 7a, 8a, 10a. The plea agreement further specified what would happen if Hunter nonetheless appealed: The Government would "assert its rights under this agreement and seek specific performance" of Hunter's appeal waiver. *Id.*, at 7a. Finally, the agreement provided that "[a]ny modification" of its terms—including of the appeal waiver—"must be in writing and signed by all parties." *Id.*, at 15a.

After the agreement was reached, the District Court held a hearing to decide whether to accept Hunter's plea. To ensure that Hunter fully grasped the consequences of the agreement, the court went over each of its terms. Upon reaching the appeal waiver, the court read it aloud, explained what it meant—among other things, that "[b]asically you're agreeing to whatever sentence I impose"—and asked Hunter whether he understood. App. 11. When Hunter replied "Yes" to that and similar questions, the court deemed the plea "knowing and voluntary," adjudged Hunter guilty of aiding and abetting wire fraud, and scheduled a sentencing hearing. *Id.*, at 11, 14–15; see *id.*, at 11–15.

At that hearing, much of the discussion focused on a condition of supervised release that the Probation Office recommended go into effect once Hunter completed his prison

sentence. According to the Office's presentence report, Hunter "suffers from symptoms of anxiety and depression" and "has refused medication to treat his symptoms." Presentence Report in No. 23–cr–85 (SD Tex.), ECF Doc. 125, p. 19. The report thus proposed that, while on supervised release, Hunter be required to "participate in a mental-health treatment program" and to "take all mental-health medications that are prescribed by [his] treating physician." *Id.*, at 24. Hunter objected to the mandatory-medication part of that condition, saying that he should not "be forced to medicate." App. to Pet. for Cert. 24a. The judge responded that if "the treatment provider prescribes drugs, you should take them," while also telling Hunter that he could "address" any future dispute about medication "to the probation officer" or, if needed, "to me." *Ibid.*

The District Court later imposed its sentence and made closing remarks, including a fairly inexplicable one at issue here. Under the sentence, Hunter would have to serve 51 months in prison, followed by three years of supervised release. The release conditions would include the medication requirement to which Hunter had objected. After specifying those terms, the court granted the Government's motion to dismiss the remaining counts in the indictment, confirmed with Hunter's lawyer that the Government had complied with the plea agreement, and finally addressed Hunter. The court said: "All right. You have a right to appeal. If you wish to appeal, [your trial counsel] will continue to represent you." *Id.*, at 36a. Then turning back to the lawyers, the court asked whether either "wish[ed] to say anything else." *Ibid.* Hunter's lawyer answered: "Nothing from the defense." The prosecutor replied: "Your Honor, I believe—well, no. I—no." *Ibid.* And the hearing adjourned.

Hunter promptly appealed, challenging the mandatory-medication condition. That condition, he argued, "infringe[d] on [his] fundamental due process liberty interest in being free of unwanted mental health medication." Brief

for Appellant in No. 24–20211 (CA5), p. 9. The Government sought dismissal, citing the appeal waiver in Hunter's plea agreement. Hunter acknowledged that he had knowingly and voluntarily signed on to that provision, but urged two reasons for still permitting the appeal to proceed. Most broadly, he contended that an appeal waiver is unenforceable when the disputed aspect of a sentence "violates a fundamental constitutional right." *Ibid.* In the alternative, he asserted that the District Court's representation at sentencing that he had a right to appeal, along with the prosecutor's failure to object, voided the appeal waiver he had made. See *id.*, at 8–9.

The Court of Appeals for the Fifth Circuit dismissed Hunter's appeal based on the waiver provision. The court first concluded that the District Court's misstatement at sentencing "did not impact the validity of the appeal waiver." 2024 WL 5003582, \*1 (Dec. 6, 2024) (*per curiam*). And such a waiver, the court next held, controls even if the District Court imposed an "unconstitutional sentence." *Ibid.* (citing *United States* v. *Barnes*, 953 F. 3d 383, 389 (CA5 2020)). Under Circuit precedent, the "general rule" that appeal waivers are enforceable has "only two exceptions": when the waiver itself was "tainted by ineffective assistance of counsel" and when the challenged sentence "exceed[ed] the statutory maximum." *Id.*, at 388–389; *United States* v. *White*, 307 F. 3d 336, 339 (CA5 2002). Because neither exception applied, Hunter's appeal could not go forward.

We granted certiorari, 607 U. S. 961 (2025), because the Courts of Appeals have differed on when appeal waivers are unenforceable in the sentencing context. Most have held that a waiver cannot be enforced if doing so would result in a miscarriage of justice.[1] The Fifth Circuit and a few others

—————

[1] See *United States* v. *Boudreau*, 58 F. 4th 26, 33 (CA1 2023); *United States* v. *Khattak*, 273 F. 3d 557, 562 (CA3 2001); *United States* v. *Smith*,

have declined that route, instead specifying just a few discrete circumstances in which an appeal can occur despite a waiver.[2]  Today, we adopt the "miscarriage of justice" approach, and accordingly remand this case to the Fifth Circuit to consider whether, under that standard, Hunter's appeal should still be dismissed.

## II

Before getting to that issue, though, we pause to address the more case-specific argument Hunter makes for allowing him to appeal: that at his sentencing hearing, the District Court said he could, and the Government did not object.  If that alone were enough to negate a knowing and voluntary appeal waiver, Hunter could bring his appeal regardless of our resolution of the just-described Circuit split.  But it is not enough: Contrary to Hunter's arguments, the court's remark did not modify the plea agreement, nor did the Government's failure to object give up its ability to later enforce the agreement's terms.

First, the court's statement about appeal rights could not have "orally modified the plea agreement" between Hunter and the Government.  Brief for Hunter 12.  That agreement, as earlier noted, was specific about how modifications could occur: only if "in writing and signed by all parties."  App. to Pet. for Cert. 15a; see *supra*, at 2.  And even assuming away that provision, nothing that happened in the sentencing hearing shows the mutual agreement between parties

_____

134 F. 4th 248, 261 (CA4 2025); *United States* v. *Andis*, 333 F. 3d 886, 891–892 (CA8 2003); *United States* v. *Wells*, 29 F. 4th 580, 583 (CA9 2022); *United States* v. *Holzer*, 32 F. 4th 875, 886 (CA10 2022); *United States* v. *Guillen*, 561 F. 3d 527, 531–532 (CADC 2009); see also *United States* v. *Riggi*, 649 F. 3d 143, 148 (CA2 2011) (adopting a differently framed but substantively similar exception).

[2] See *United States* v. *Barnes*, 953 F. 3d 383, 388–389 (CA5 2020); *Portis* v. *United States*, 33 F. 4th 331, 339 (CA6 2022); *United States* v. *Nulf*, 978 F. 3d 504, 507 (CA7 2020); *King* v. *United States*, 41 F. 4th 1363, 1368, n. 3 (CA11 2022).

needed to accomplish a modification. See *Hawkins* v. *United States*, 96 U. S. 689, 696 (1877) ("Mutual consent is required to modify" an agreement). There was neither an offer nor an acceptance by those parties, and so no conceivable meeting of the minds. It seems unlikely that, as Hunter urges, the court's statement was meant to produce a modification, see Brief for Hunter 42; far more likely, given that the court did not refer to the parties' bargain, that its statement was merely a momentary mistake. But whatever the court's intent, its statement about appeal rights could not change Hunter and the Government's agreement. For that purpose, it is the parties' intent that matters, and their non-response response to the judge's representation falls far short of showing that they agreed to alter a conflicting term.

Second, the Government did not forever "relinquish[] its appeal-waiver argument" by failing to correct the court's misstatement. *Id.*, at 12. The prosecutor's swallowed retort at the hearing ("Your Honor, I believe—well, no. I—no") neither waived nor forfeited, as Hunter claims, the right to seek future enforcement of Hunter's agreement not to appeal. See *ibid.* Under ordinary litigation principles, a waiver of a right requires some affirmative signal of "abandonment." *United States* v. *Olano*, 507 U. S. 725, 733 (1993). Staying silent—as here, not picking a fight—does not qualify. By contrast, forfeiture generally does happen through silence, because it "is the failure to make the timely assertion of a right." *Ibid.* But the proper time for the Government to assert its right to enforce an appeal waiver is not at a sentencing hearing. Rather, it is after a defendant has filed a notice of appeal. It is only then that the Government can assess whether the appeal violates the agreement's terms and, even if so, whether to turn a blind eye. See *Garza* v. *Idaho*, 586 U. S. 232, 238–239 (2019). So here, the Government's nonobjection during the sentencing proceeding was not a "failure to make the *timely* assertion" of

its enforcement right. *Olano*, 507 U. S., at 733 (emphasis added). That assertion—or its absence—would happen only later on.

Our decision that Hunter's appeal waiver remains valid matches one we reached in a nearly mirror-image case. In *Class* v. *United States*, 583 U. S. 174 (2018), the defendant's plea agreement did not include an appeal waiver, but during the plea colloquy the District Court mistakenly stated that the defendant was "giving up [his] right to appeal [his] conviction." *Id.*, at 185 (alterations in original). The defendant agreed to the court's representation. When he later filed a notice of appeal, the Government argued that he had relinquished his appeal right in that courtroom exchange. We rejected that view, holding that the defendant's "acquiescence neither expressly nor implicitly waived his right to appeal." *Ibid.* Similarly in this case, any acquiescence that the Government's silence conveyed "neither expressly nor implicitly" gave up its right under the plea agreement. It is just that here the relevant right is not to appeal, but instead to enforce the appeal waiver.

### III

The question then becomes whether that right to enforce has limits (beyond any stated in the agreement itself ) and, if so, what they are. It is common ground that an appeal waiver, like the rest of a plea agreement, must be knowing and voluntary to be valid and thus to be enforceable. See *Brady* v. *United States*, 397 U. S. 742, 748 (1970).[3] Related to that settled rule is another: An appeal waiver, again like the rest of the agreement, is not knowing and voluntary if it was the product of ineffective assistance of counsel. See *Hill* v. *Lockhart*, 474 U. S. 52, 56 (1985) ("[T]he

—————

[3] We do not otherwise address in this opinion the circumstances in which an appeal waiver might be invalidly obtained, as through fraud or coercion. We instead discuss only when a validly obtained waiver may become unenforceable.

voluntariness of [a] plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases"). So an appeal waiver tainted by ineffective assistance is not enforceable.[4] Putting that to the side, the Fifth Circuit, as noted above, holds appeal waivers unenforceable in only one circumstance: when the sentence sought to be appealed exceeds the statutory maximum. See *supra*, at 4. The Government here espouses yet a stricter view, maintaining that knowing and voluntary appeal waivers are always enforceable. See Brief for United States 10, 12, 30–31; Tr. of Oral Arg. 63–64. But as Hunter notes, most courts of appeals have instead taken a less stringent approach, declining to enforce appeal waivers when doing so would produce a "miscarriage of justice." See Brief for Hunter 34–37; *supra*, at 4–5, and n. 1. Which position is right?

The answer stems from the special, and indeed pivotal, role of the judiciary in approving and implementing appeal waivers. Such a provision, of course, is part of the bargain struck by a defendant and prosecutor, without judicial involvement. See Fed. Rule Crim. Proc. 11(c)(1). But the district court must accept the plea agreement, including any appeal waiver, before it can go into effect. See Rule 11(c)(3)(A) ("[T]he court may accept the agreement, reject it, or defer a decision"). And that decision is one given over

_____

[4] Every Circuit, including the Fifth, has recognized as much. See *United States* v. *Ortiz-Vega*, 860 F. 3d 20, 28 (CA1 2017); *United States* v. *Lloyd*, 901 F. 3d 111, 124 (CA2 2018); *United States* v. *Fazio*, 795 F. 3d 421, 426 (CA3 2015); *Smith*, 134 F. 4th, at 261; *Barnes*, 953 F. 3d, at 388–389; *United States* v. *Toth*, 668 F. 3d 374, 377–378 (CA6 2012); *Nulf*, 978 F. 3d, at 506–507; *Andis*, 333 F. 3d, at 890–891; *United States* v. *Silveira*, 997 F. 3d 911, 913 (CA9 2021); *Holzer*, 32 F. 4th, at 886; *United States* v. *Puentes-Hurtado*, 794 F. 3d 1278, 1284 (CA11 2015); *Guillen*, 561 F. 3d, at 530–531. And in any event, the Government appears to include an ineffective-assistance exception in all plea agreements it makes, as it did in Hunter's. See U. S. Dept. of Justice, Manual §9–16.330 (Jan. 2020); *supra*, at 2.

to "sound judicial discretion." *Santobello* v. *New York*, 404 U. S. 257, 262 (1971); see Advisory Committee's Notes on 1974 Amendment to Fed. Rule Crim. Proc. 11, 18 U. S. C. App., p. 53 ("[T]he acceptance or rejection of a plea agreement" is "left to the discretion of the individual trial judge"). If thus approved, an appeal waiver next falls into the lap of a court of appeals, which has exclusive control over its operation. Nothing, after all, literally prevents a defendant who has signed such a waiver from filing an appeal: The court's docket is as open to him as to any other unhappy litigant. So the real-world effect of a waiver provision turns, and turns only, on whether the appeals court decides to enforce it. And the consequence of that decision has everything to do with courts and the judgments they render. If enforced, the appeal waiver will, by eliminating judicial review, cement into place a district court's sentence, whether or not lawful. From start to finish, then, courts are in the middle of, and partly responsible for, appeal waivers and their results.

Because that is so, the standard for enforcing appeal waivers implicates the interests not only of the agreement's parties, but also of the judiciary. If a court always carries out those waivers—no matter the kind or degree of error tainting a sentence—the judicial system's integrity may come into question. This Court has explained the point when addressing waivers of other rights held by criminal defendants. In *Wheat* v. *United States*, 486 U. S. 153 (1988), for example, we held that a defendant's waiver of a lawyer's conflict of interest did not necessarily "cure[] [the] problem[]" because he was not the only one with a stake: The "[f]ederal courts," we reasoned, have an "independent" "institutional interest" in ensuring that legal proceedings "appear fair to all who observe them." *Id.*, at 160. So too, in *United States* v. *Mezzanatto*, 513 U. S. 196 (1995), we recognized that some evidentiary rules may be "so fundamental" to a trial's legitimacy that they could not be waived

"without irreparably discrediting the federal courts."  *Id.*, at 204 (alteration omitted).  To show the idea's obviousness, we borrowed from a court of appeals' opinion: "[I]f the parties stipulated to trial by 12 orangutans[,] the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants."  *Ibid.* (quoting *United States* v. *Josefik*, 753 F. 2d 585, 588 (CA7 1985) (Posner, J.)).  But more prosaic examples are not hard to come by: "We have repeatedly stressed the importance" of "the interest of the Judiciary and the public in correcting grossly prejudicial errors of law that undermine confidence in our legal system."  *Greenlaw* v. *United States*, 554 U. S. 237, 262 (2008) (ALITO, J., dissenting) (citing cases).  And that interest, for the reasons just given, may be in play when a court is called on to enforce an appeal waiver.  Whatever the parties have agreed to, the court's own responsibility is apparent, and so automatic enforcement may "risk[] institutional harm."  *Mezzanatto*, 513 U. S., at 205.

For that reason, neither the Government's nor the Fifth Circuit's proposed rule can be the right one.  The Government's maximalist position first runs into the scenario that even the Fifth Circuit will not tolerate: when a judge imposes on a defendant who has signed an appeal waiver a sentence beyond what the relevant statute allows.  See *United States* v. *Kim*, 988 F. 3d 803, 810, n. 1 (CA5 2021) (declining to enforce an appeal waiver in such a case because of "the legal truism that a court must not impose a sentence" that is "unauthorized by law").  Suppose, for example, that a judge sentences a misdemeanant to life in prison, when the applicable law caps a prison term at one year.  If an appellate court had to dismiss the resulting appeal, it would call into doubt the judicial system's very attachment to law.  But so too would a dismissal in certain other situations, which fall outside both the Government's

and the Fifth Circuit's rules. Consider some examples offered at oral argument in this case. If, say, the sentencing judge was biased against individuals of one race or religion, and unconstitutionally considered that factor in imposing a sentence. See Tr. of Oral Arg. 64. Or if the judge (as in an actual case) imposed as a condition of supervised release that the defendant not become pregnant. See *id.*, at 77; *People* v. *Zaring*, 8 Cal. App. 4th 362, 373–375 (1992). Or if the judge, to use a variation on *Mezzanatto*'s absurdity, "let an orangutan pick a sentence out of a hat." Tr. of Oral Arg. 66; see *supra*, at 10. Those sentences would likewise impugn the judiciary's integrity if an appeal waiver compelled them to stand. However certain the parties' agreement, the courts are too enmeshed in its approval and implementation to escape responsibility for such results.

We thus approve the majority view among the courts of appeals that an appeal waiver is unenforceable when it would result in a miscarriage of justice. That rule, properly understood and applied, sets a high bar: The waiver may be set aside only if the sentence is marred by the kind of egregious error that would bring the judicial system into disrepute. The error must be obvious—not one a judge could reasonably make. And it must be of the type that would undermine public confidence in the judiciary. Sentencing is a complex affair in our criminal justice system, involving for example the detailed calculation of a Sentencing Guidelines range and the mandatory consideration of multiple sentencing factors. In that endeavor, it is unfortunate but inevitable that mistakes will occur. Such standard-fare errors in misapplying sentencing law cannot cancel an appeal waiver. Were they to do so, the utility of waivers in plea negotiations could plummet: such a provision would have less value to the Government, and so might induce fewer concessions to a defendant. And still more to our point, that kind of standard error is not likely to discredit the judiciary's commitment to law. But some faults in sentencing

can. So a high bar is not the same as an insurmountable one. The point of the miscarriage-of-justice limit, as many appellate courts have properly applied it, is to offer a safety valve for extreme cases—a way out of a waiver when the justice system's basic integrity is at stake.

The nature of the miscarriage-of-justice limit precludes any attempt to list all the situations in which it will overcome an appeal waiver. Extreme cases, after all, are hard to anticipate before they happen. But a few examples of the kinds of errors we mean—the kind that would bring the judiciary into disrepute—may provide guidance to lower courts. First, a defendant may appeal a sentence exceeding what the relevant statute allows—most commonly, a term of years above the maximum prescribed. See, *e.g.*, *Kim*, 988 F. 3d, at 810–811, and n. 1; *supra*, at 10. Second, a defendant may appeal a sentence that is infected with a blatant constitutional error, such as when a judge takes account of a constitutionally impermissible factor (like race) or imposes a constitutionally infirm condition of supervised release (like barring a defendant from becoming pregnant). See, *e.g.*, *United States* v. *Elliott*, 264 F. 3d 1171, 1173 (CA10 2001); *supra*, at 11. And third, a defendant may appeal if his sentence was imposed without "some minimum of civilized procedure" as in, yes, the "twelve orangutans" case—or less extravagantly, one in which the judge refused to hold a hearing consonant with basic principles of law. *United States* v. *Adkins*, 743 F. 3d 176, 192–193 (CA7 2014); see *United States* v. *Behrens*, 375 U. S. 162, 165–166 (1963). These examples are just examples, not intended to be exclusive, but they serve to illustrate the high bar a defendant must surmount to overcome an appeal waiver.

Contrary to the Government's assertion, we doubt that such a confined exception to the rule of enforcement will "open the floodgates" to "waived appeals." Tr. of Oral Arg. 60, 87; see *id.*, at 62. As earlier noted, many Circuits already place a miscarriage-of-justice limit on appeal

waivers. See *supra*, at 4–5, n. 1. The Government has offered no evidence that those courts are awash with appeals, much less ones demanding serious litigation. Nor is that dearth of support surprising. The Circuits using the miscarriage-of-justice approach have mainly understood it to erect a substantial barrier, just as we require today. See, *e.g.*, *United States* v. *Santiago*, 769 F. 3d 1, 8 (CA1 2014) (The "exception is meant only for egregious cases and is to be applied sparingly"); *United States* v. *Andis*, 333 F. 3d 886, 891 (CA8 2003) (The exception is "a narrow one" because appeal waivers "should not be easily voided"). Such a hard-to-meet standard presumably deters many appeals. And those still filed can often be quickly dismissed because the errors asserted are uncertain or ordinary. Thankfully, the kinds of sentences that raise miscarriage-of-justice concerns, as we have described them, are rare in our justice system. The possibility of correction helps keep them so, and thus safeguards that system's integrity, without imposing excessive burdens on either the appeals courts or the Government.

Hunter and the Government here dispute whether, under the right legal standard, his appeal can go forward. Recall that Hunter wants to challenge the District Court's requirement that, while on supervised release, he "take all mental-health medications" that his physician prescribes. See *supra*, at 3. In Hunter's view, "[t]he right to be free from coerced medical treatment is fundamental," and the District Court infringed on it without sufficient basis. Brief for Hunter 28; see Reply Brief 17–18 (citing 18 U. S. C. §3583(d)(2)). In the Government's opposing view, a sentencing court may demand that a defendant take medication when he has suffered from mental-health problems, as the presentence report found Hunter had done. Brief for United States 37 (citing §3563(b)(9)).

In keeping with our usual practice, we decline to decide in the first instance how that dispute should come out

under the miscarriage-of-justice approach we adopt today. The Court of Appeals did not address that question, because its Circuit precedent required a narrower inquiry. And we are, as we usually say, "a court of review, not of first view." *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005). It is therefore now up to the Fifth Circuit to decide whether enforcing Hunter's appeal waiver would result in a miscarriage of justice.

Accordingly, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–1063

———————

## MUNSON P. HUNTER, III, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2026]

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, concurring.

In our times, the jury trial has given way to a conveyor belt of plea bargains. At least some responsibility for that development lies with this Court. When confronted with coercive prosecutorial tactics designed to induce defendants to take plea deals, the Court has often condoned those practices or let them pass in silence.

Today, the Court begins to correct course. It rules that prosecutors may not always leverage their plea-bargaining power to induce a defendant to forego the right to contest his sentence on appeal. I agree and write separately to outline how we got here and some of the work still ahead.

I

Because the facts of this case are emblematic of many others, they are worth pausing over. In 2023, the federal government secured a 10-count indictment against Munson Hunter for his alleged role in various fraudulent transactions. Four of the charges focused on a single transaction, while the remaining six focused on others. Altogether, the government's charges threatened Mr. Hunter with up to 300 years in prison and a $10 million fine. After bringing these charges, though, prosecutors offered Mr. Hunter a deal. If he agreed to waive his right to trial and plead guilty

to one count of wire fraud based on a single transaction worth $38,648.77, prosecutors said they would drop the remaining charges against him.  Unsurprisingly, Mr. Hunter agreed.  Ultimately, the deal the parties struck also included an appeal waiver.  By its terms, Mr. Hunter waived not only his right to appeal his conviction.  He also waived his right to appeal whatever sentence the district court might later impose.  App. to Pet. for Cert. 6a (Pet. App.).

After the district court signed off on the parties' deal and accepted Mr. Hunter's guilty plea, it turned to the question of an appropriate sentence.  While Mr. Hunter pleaded guilty and admitted to stealing $38,648.77 in one transaction, the district court proceeded to sentence him as someone who stole $488,352.25 in 26 transactions.  See *id.*, at 20a–21a; Presentence Investigation Report in No. 23–cr–85 (SD Tex.), ECF Doc. 125, pp. 10–13.  Some of these additional funds and transactions were the subject of counts the government agreed to dismiss in exchange for Mr. Hunter's guilty plea.  Other funds and transactions were not even the subject of the government's charges.  See *ibid.*; Superseding Indictment in No. 23–cr–85 (SD Tex.), ECF Doc. 74.

This made a significant difference for Mr. Hunter.  Had the district court sentenced him based on the amount he had pleaded guilty to stealing, he would have faced an advisory sentencing guidelines range of 15 to 21 months in prison.  See Pet. App. 25a; United States Sentencing Commission, Guidelines Manual §2B1.1(b)(1) (Nov. 2023); *id.*, ch. 5, pt. A (sentencing table).  Now, though, he faced a recommended prison term of 41 to 51 months.  Pet. App. 25a.  And based on that calculation, the district court chose a prison sentence of 51 months.  The result?  A guilty plea to a single charge enabled prosecutors to secure a punishment based on other charges they had agreed to drop or had not even brought.

That was not all.  The district court ordered Mr. Hunter to serve time on supervised release after leaving prison.  As

part of his supervised release, the court directed Mr. Hunter to comply with various conditions, one of which is of special relevance here. It arose this way. Before sentencing, Mr. Hunter met with a probation officer. There, he "'self-reported'" a history of mental health diagnoses. Brief for United States 7. As it turned out, that honesty came with a price. At sentencing, the probation officer urged the district court to require Mr. Hunter to "'participate in a mental-health treatment program' and 'take all mental-health medications that are prescribed by [his] treating physician'" while on supervised release. *Ibid.*

Mr. Hunter objected to one part of this recommendation. He did not dispute that he has suffered from mental health issues. He even said that he "want[ed] to take mental health programs." Pet. App. 24a. But, he added, "I don't want to take any medication. I don't drink. I don't use drugs. I don't even curse. I don't want to have to be forced to medicate." *Ibid.* In response, the court did not find that forcing Mr. Hunter to take psychiatric medication against his will would further any particular goal of criminal punishment. But it imposed the condition anyway.

After sentencing, Mr. Hunter sought to appeal the district court's forced-medication condition to the Fifth Circuit. There, he pointed to this Court's decisions holding that individuals enjoy a "constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Sell* v. *United States*, 539 U. S. 166, 178 (2003) (internal quotation marks omitted). Under those precedents, he argued, the district court could not constitutionally force him to take psychiatric medication absent compelling evidence that it was necessary to promote a valid sentencing-related interest. And, he submitted, the district court had no compelling evidence before it that forcing him to take psychiatric medication would advance a legitimate penological interest associated with his crime of stealing

$38,648.77. See Brief for Appellant in No. 24–20211 (CA5), pp. 10–11.

The Fifth Circuit dismissed the appeal. In doing so, it assumed that the district court had committed a constitutional error in ordering Mr. Hunter to take psychiatric medication. Even so, the Court of Appeals held, it was powerless to say so. Because Mr. Hunter had agreed to an appeal waiver, the court concluded, it couldn't hear his case. See Pet. App. 2a.

## II

The most remarkable thing about Mr. Hunter's plea-bargaining journey may be how unremarkable it is. Our criminal justice system is no longer dominated by trials and sentences based on them, but plea bargains that work out in ways not unlike his own.

Of course, it was not always so. At the Nation's founding, the right to trial by jury was considered part of every American's "birth-right and inheritance." 3 J. Story, Commentaries on the Constitution of the United States §1773, p. 652 (1833). Outraged by British efforts to deny that right in the colonies, those who fought the Revolution cited its suppression as one of their reasons for declaring independence. Declaration of Independence ¶20. After the Revolution, too, the founding generation took care to secure the right to trial by jury in criminal cases not just once, but twice, in the Constitution and Bill of Rights they adopted. Art. III, §2, cl. 3; Amdt. 6; see also *Erlinger* v. *United States*, 602 U. S. 821, 829–832 (2024).

Really, it seems plea bargains didn't begin to emerge as an alternative to trial in serious criminal cases until the mid-nineteenth century. See C. McCoy, Plea Bargaining as Coercion, 50 Crim. L. Q. 67, 73–74 (2005). And even then, the practice usually met with intense judicial skepticism. Many judges considered the "idea that the jury right could become the subject of an agreement between the prosecutor

and the defendant . . . abhorrent." N. King, Priceless Process: Nonnegotiable Features of Criminal Litigation, 47 UCLA L. Rev. 113, 125 (1999) (collecting cases); see also A. Alschuler, Plea Bargaining and Its History, 79 Colum. L. Rev. 1, 19–22 (1979) (same).

That skepticism continued well into the twentieth century. In *Walker* v. *Johnston*, 312 U. S. 275 (1941), this Court held that a defendant is "deprived of a constitutional right" whenever he is "deceived or coerced by the prosecutor into entering a guilty plea." *Id.*, at 286. The prosecutor's alleged tactics there? Obstructing the defendant's effort to hire a lawyer, showing the defendant "pictures of the scene of the alleged crime," seeking to "persuade him that he would be proved guilty," and "warning him that he would be sentenced to twice as great a [prison] term if he did not" agree to plead guilty. *Id.*, at 281–282.

The Court repeated the message in *Machibroda* v. *United States*, 368 U. S. 487 (1962). "A guilty plea . . . is void," the Court ruled, when it is "induced by promises or threats which deprive it of the character of a voluntary act." *Id.*, at 493. There, too, the Court expressed "no doubt" that a defendant "is entitled to have his sentence vacated" when a prosecutor promises a certain sentence in exchange for a guilty plea, discourages the defendant from communicating with his attorney about the plea offer, and threatens the defendant with additional charges if he "make[s] a scene" before sentencing. *Id.*, at 489–490, 493 (internal quotation marks omitted).

Eventually, though, this Court took a dramatic turn. In 1971, it proclaimed plea bargaining "highly desirable," something "to be encouraged," and "an essential component of the administration of justice." *Santobello* v. *New York*, 404 U. S. 257, 260–261. "If every criminal charge were subjected to a full-scale trial," the Court worried, "the States and the Federal Government would need to multiply by many times the number of judges and court facilities." *Id.*,

at 260; see also *Brady* v. *United States*, 397 U. S. 742, 745–
746, 749–753 (1970) (upholding the validity of a plea en-
tered pursuant to a sentencing scheme the Court had inval-
idated as unconstitutionally coercive just two years earlier).

   *Bordenkircher* v. *Hayes*, 434 U. S. 357 (1978), illustrates
the kind of coercive tactics this Court became willing to
stomach in the name of facilitating plea deals. That case
began when authorities indicted Paul Hayes, a Kentucky
man, for forging an $88.30 check. *Id.*, at 358. Punishable
by 2 to 10 years in prison, the charge led to plea negotia-
tions. *Ibid.* If Mr. Hayes would save the government from
"the inconvenience . . . of a trial," the prosecutor offered to
recommend a 5-year prison sentence. *Ibid.* (internal quota-
tion marks omitted). But if not, the prosecutor warned, he
would return to the grand jury and seek a further indict-
ment under a Kentucky three-strikes law carrying a life
sentence. *Id.*, at 358–359. When Mr. Hayes refused the
deal, the prosecutor proved true to his word. *Id.*, at 359. He
sought and secured the new indictment as promised. *Ibid.*
And, after a jury convicted, Mr. Hayes received a life sen-
tence. See *ibid.*

   In a decision perhaps unthinkable only a few decades ear-
lier, this Court in *Bordenkircher* endorsed the prosecutor's
tactics. However things might work in "'an ideal world,'"
the Court said, "'the fact is that the guilty plea and the of-
ten concomitant plea bargain are important components of
this country's criminal justice system.'" *Id.*, at 361–362
(quoting *Blackledge* v. *Allison*, 431 U. S. 63, 71 (1977)). As
the Court saw things, prosecutors need room to issue
threats in plea bargaining—even when it means threaten-
ing a life sentence for a forged check worth less than $100.
434 U. S., at 363–365.

   Unsurprisingly, prosecutors quickly began taking full ad-
vantage of this new judicial latitude. See W. Stuntz, The
Collapse of American Criminal Justice 259–260 (2011).
They threatened layers of additional charges and decades

of additional prison time if defendants dared to exercise their right to trial by jury. *Ibid.* Prosecutors sometimes promised charges against defendants' spouses and parents too. See *id.*, at 260. "[T]hreats [that] would be deemed extortionate" "[o]utside the plea bargaining process" became "par for the course" in our criminal justice system. *Ibid.*

To be sure, this Court is not wholly responsible for these developments. Other causes are at play as well. Since the 1970s, the number of federal criminal laws has grown rapidly. The prison terms attached to federal crimes have also grown. Some now say there is not an adult American who has not committed one felony or another. D. Husak, Overcriminalization: The Limits of the Criminal Law 24 (2008). Federal sentencing guidelines, as well, currently recommend higher sentences for most defendants who "exercise [their] constitutional right to trial." USSG §3E1.1, and comment., n. 2. And while prosecutors once felt constrained by "the traditional maxim that 'an indictment should not include more than one felony,' . . . today's prosecutors [often] bring as many overlapping felony charges as they can in a single case." *Barrett* v. *United States*, 607 U. S. 128, 150–151 (2026) (GORSUCH, J., concurring in part) (quoting *Pointer* v. *United States*, 151 U. S. 396, 403 (1894)).

Together with this Court's approval of aggressive negotiating tactics, developments like these have made it easier than ever for prosecutors to cajole defendants into pleading guilty. So much so that perhaps 95 percent of convictions now come by way of plea bargains. See R. Barkow, Justice Abandoned 74–75 (2025). These days, plea bargaining is not just "some adjunct to the criminal justice system; it *is* the criminal justice system." R. Scott & W. Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992).

## III

If plea bargaining on this scale and in this manner is a modern phenomenon, appeal waivers represent a more

recent development yet. Pursuant to an appeal waiver, a
defendant usually must agree to waive not only any right
he may have to contest his conviction on appeal. See 28
U. S. C. §1291; *Class* v. *United States*, 583 U. S. 174, 178–
182 (2018). Typically, he must also agree to waive his right
to appeal any sentence a district court might issue after ac-
cepting his guilty plea. See 18 U. S. C. §3742. A defendant
must do so even though he does not yet know what that
sentence will be. And he must do so even while the govern-
ment retains *its* right to appeal any decision it doesn't like.
Forty years ago, appeal waivers like these "were rare or
nonexistent." A. Alschuler, Plea Bargaining and Mass In-
carceration, 76 N. Y. U. Annual Survey of Am. Law 205,
226, and n. 146 (2021). Today, they are commonplace. See
Q. Sorenson, Appeal Rights Waivers, The Federal Lawyer,
Oct./Nov. 2018, p. 33; S. Klein, A. Remis, & D. Elm, Waiving
the Criminal Justice System, 52 Am. Crim. L. Rev. 73, 85–
87, 122 (2015).

Consider what this means. Because a defendant con-
fronted with an appeal waiver during plea bargaining does
not know what sentence a court will issue, he must negoti-
ate in the dark. What if, as the Fifth Circuit assumed here,
the sentencing judge imposes a punishment the Constitu-
tion does not tolerate? What if the judge fails to respect this
Court's precedents and Congress's statutes governing how
he must proceed at sentencing and what punishments he
may lawfully issue? What if a judge goes so far as to allow
an orangutan to pick the defendant's sentence from a hat?
As the government tells it, a defendant with an appeal
waiver has no way to correct any of these errors on appeal
(yes, even when it comes to the orangutan, see Tr. of Oral
Arg. 65–66, 91–92). And yet, because an appeal waiver may
often be bundled together with other terms in a plea deal in
a take-or-leave package, a defendant may often have little
choice but to accept risks like these—especially given the
consequences prosecutors can visit on those who refuse.

Much as plea bargaining initially met with judicial skepticism, so did appeal waivers. Some district court judges refused to accept plea agreements that included appeal waivers or struck those waivers completely. See, *e.g.*, *United States* v. *Raynor*, 989 F. Supp. 43 (DC 1997) (Friedman, J.); *United States* v. *Johnson*, 992 F. Supp. 437 (DC 1997) (Greene, J.); *United States* v. *Perez*, 46 F. Supp. 2d 59 (Mass. 1999) (Gertner, J.); see also *United States* v. *Melancon*, 972 F. 2d 566, 571 (CA5 1992) (Parker, J., concurring specially). But with time, and subject to differing exceptions, Courts of Appeals largely came to accept appeal waivers, much as courts had previously come to accept plea bargains themselves. See *United States* v. *Guillen*, 561 F. 3d 527, 529, and n. (CADC 2009). For its part, this Court allowed debates over appeal waivers to proceed in the lower courts for years without comment, offering no statement on their legality or "on what particular exceptions may be required." *Garza* v. *Idaho*, 586 U. S. 232, 239, n. 6 (2019).

IV

Today, the Court breaks its silence. Agreeing with Mr. Hunter and certain Courts of Appeals, it holds that an appeal waiver is unenforceable when a defendant seeks to appeal a sentence that represents a "miscarriage of justice." *Ante,* at 11. To illustrate what this standard means, the Court offers some "examples." *Ante,* at 12. At the same time, the Court takes care to emphasize that these examples are "not intended" to be "exclusive." *Ibid.*

All that is a welcome first step. But it also leaves lower courts considerable work ahead to flesh out the standard the Court announces. Fortunately, it seems to me that decisions from Courts of Appeals that already apply the miscarriage-of-justice rule the Court "approve[s]" of today, *ante,* at 11, 4–5, n. 1, along with certain of our own existing precedents, can help illuminate the path forward.

Start with this Court's first example of a miscarriage of justice, "a sentence exceeding what the relevant statute allows." *Ante,* at 12.  Or, put another way, a sentence "not authorized by law."  *United States* v. *Phillips*, 124 F. 4th 522, 528 (CA8 2024) (internal quotation marks omitted). This category of course embraces sentences that exceed the "maximum prescribed" by statute.  *Ante,* at 12.  But, consistent with lower court decisions, the category should likewise include sentences imposing penalties the law reserves for offenses different than those of which the defendant stands convicted.  See *Phillips*, 124 F. 4th, at 527–528 (ban on receiving federal benefits).  Or ones that order remedies the law does not permit.  See *United States* v. *Yung*, 37 F. 4th 70, 82 (CA3 2022) (restitution).  And perhaps mandatory minimum sentences for which the defendant does not qualify.  See 18 U. S. C. §924(e).

Now take the Court's next example, a sentence premised on "a blatant constitutional error."  *Ante,* at 12.  As the Court explains, that includes not only sentences based on "constitutionally impermissible factor[s]" such as race, religion, or sex.  *Ibid.*  It also extends to "constitutionally infirm condition[s] of supervised release."  *Ibid.*  Accordingly, a defendant may be able to appeal a sentence imposing a condition of release that violates his right to be free from forced medication, or a condition that violates his right to speak or worship freely, or any other condition that violates one of his recognized constitutional rights.  Really, I would think a miscarriage of justice all but certain to arise whenever a sentence infringes a constitutional right that was "firmly established at the time of sentencing."  *United States* v. *Carter*, 87 F. 4th 217, 225 (CA4 2023) (internal quotation marks omitted); see also *United States* v. *Del Valle-Cruz*, 785 F. 3d 48, 56–57 (CA1 2015) (constitutional right to raise one's child).

Next, consider the Court's third example, sentences marred by serious procedural errors.  *Ante,* at 12.  That

includes not only a sentence chosen by an orangutan, see *supra*, at 8–9, but others reflecting a marked departure from mandatory sentencing procedures. *Ante,* at 12; see also *Gall* v. *United States*, 552 U. S. 38, 49–51 (2007) (outlining sentencing procedures). Appreciating as much, Courts of Appeals have often declined to enforce appeal waivers when a district court breaks from rules requiring it to give reasons for its chosen sentence or address a defendant's non-frivolous arguments for a different one. See, *e.g.*, *United States* v. *Smith*, 134 F. 4th 248, 261–263 (CA4 2025); *United States* v. *Woltmann,* 610 F. 3d 37, 39–40 (CA2 2010).

Consider also aspects of sentencing that can require a degree of judicial discretion: the application of the advisory sentencing guidelines, the imposition of supervised release conditions within statutory and constitutional bounds, and the weighing of 18 U. S. C. §3553(a)'s sentencing factors. I appreciate that "standard-fare" errors in those areas will not often clear the "high bar" the Court sets today. *Ante*, at 11. But some errors may. For example, and as we have held, the failure to correct a plain and nonharmless error in calculating an advisory guidelines range ordinarily "will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles* v. *United States*, 585 U. S. 129, 145 (2018). Indeed, "'what reasonable citizen wouldn't bear a rightly diminished view of the judicial process and its integrity if courts refused to correct obvious errors of their own devise that threaten to require individuals to linger longer in federal prison than the law demands?'" *Id*., at 141 (quoting *United States* v. *Sabillon-Umana*, 772 F. 3d 1328, 1333–1334 (CA10 2014)).

A miscarriage of justice would seem to arise, as well, when a district court metes out punishment that is so substantively unreasonable that it would fail under the "deferential abuse-of-discretion standard" that appellate courts already apply in sentencing challenges. *Gall*, 552 U. S., at

41, 51–52. Along those lines, lower courts applying the mis-carriage-of-justice rule have acknowledged that "egregious" harm necessarily results from any supervised release condition, or any other component of a sentence, "wholly unrelated to legitimate sentencing purposes" or "lacking in rationality." *United States* v. *Boudreau*, 58 F. 4th 26, 33 (CA1 2023) (internal quotation marks omitted); see also, *e.g.*, *United States* v. *Velez-Luciano*, 814 F. 3d 553, 564–565 (CA1 2016) ("a highly invasive [medical] procedure" that "has no efficacy").[1]

## V

I wonder, too, if there are even deeper problems lurking here. Yes, as Mr. Hunter argues, an appeal waiver is unenforceable when a defendant seeks to appeal a sentence that represents a "miscarriage of justice." And, yes, to resolve today's case, that is all we need decide. But, as the Court recognizes, appeal waivers may raise other problems as well. See *ante,* at 7, n. 3. Consider just a couple of them.

The Due Process Clause of the Fifth Amendment, this Court has held, tolerates only "voluntary and knowing" guilty pleas. *McCarthy* v. *United States*, 394 U. S. 459, 466 (1969). That standard is met only if the defendant "intentional[ly] relinquish[es] or abandon[s] . . . known right[s] or privilege[s]." *Ibid.* (internal quotation marks omitted). A guilty plea thus must be made both "voluntarily" and "with full understanding of the consequences." *Kercheval* v. *United States*, 274 U. S. 220, 223 (1927). It's a rule that means a defendant signing a plea agreement containing an appeal waiver must voluntarily abandon not just his right

--------

[1] To the extent JUSTICE KAVANAUGH believes the foregoing discussion contemplates "a lower bar" than is appropriate, *post*, at 1 (concurring opinion), his unexplained disagreement lies not with me, but with what many lower courts and this Court have said in the past about what kinds of errors represent miscarriages of justice or otherwise reflect adversely on the integrity of the Judiciary.

to trial but his right to appeal his conviction and sentence as well. And he must fully understand the consequences of that decision. *Ante,* at 7 ("[A]n appeal waiver, like the rest of a plea agreement, must be knowing and voluntary to be valid"); see also *Garza,* 586 U. S., at 239; *United States* v. *Davis,* 588 U. S. 445, 451 (2019) (the "first essential" of due process is "fair notice" (internal quotation marks omitted)).

Those principles may pose an independent problem for appeal waivers that purport to insulate sentencing errors from review. After all, and as the district court acknowledged in this very case, when defendants like Mr. Hunter sign plea agreements containing appeal waivers, "no one knows . . . what sentence the Court will impose." App. 8–9. Given that, how can a defendant "know" and "fully understand" at the time he signs a plea agreement that a court might later order punishment that defies the Constitution, a federal statute, or this Court's precedents? Don't the parties generally expect that a sentencing court will act consistently with the rules of law then in force? Of course, district courts must discuss an appeal waiver's general implications with a defendant before accepting a plea agreement containing one. See Fed. Rule Crim. Proc. 11(b)(1)(N); App. 10–11. But the colloquy in this case did not include— nor does anything in the Federal Rules contemplate—a warning that the district court might later violate the law. For good reason. A legal system branded with a disclaimer that its judges might violate the law would be no legal system at all.

Notably, too, this Court has found prospective waivers of many other statutory rights invalid and unenforceable. We have held that a company's prospective waiver of its right to remove lawsuits to federal court—extracted as a condition of doing business in a State—not just "void" but "repugnant to the Constitution and laws of the United States." *Home Ins. Co.* v. *Morse,* 20 Wall. 445, 454, 457–458 (1874). We have held that an employee's rights under Title VII of

the Civil Rights Act of 1964 are not susceptible of prospective waiver. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 51–52 (1974). The same goes for rights under the Fair Labor Standards Act and 42 U. S. C. §1983. *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 740 (1981); *McDonald* v. *West Branch*, 466 U. S. 284, 290 (1984). And we have similarly suggested on multiple occasions that a private agreement might not be enforced if it "operate[s] . . . as a prospective waiver of a party's right to pursue" various other "statutory remedies." *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 637, n. 19 (1985) (antitrust laws); see also *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. 247, 273 (2009) (Age Discrimination in Employment Act); *Vimar Seguros y Reaseguros, S. A.* v. *M/V Sky Reefer*, 515 U. S. 528, 539–541 (1995) (Carriage of Goods by Sea Act).

So far, the government has offered no colorable explanation why a defendant's prospective waiver of his statutory right to appeal his sentence should be treated differently. The government stresses that a criminal defendant "may always choose not to appeal" his sentence. Brief for United States 22. But a litigant may also choose not to exercise his right to remove an existing case to federal court or bring suit to vindicate a Title VII or antitrust injury. And none of that has prevented us from calling prospective waivers void in those contexts. The government also contends that prospectively waiving the right to appeal a sentence does not "implicate broader social interests that form part of [an] unalterable statutory policy." *Ibid.* (internal quotation marks omitted). But it's hard to see on what basis we might conclude that the Sentencing Reform Act's promise to defendants that they may appeal their sentences implicates "social interests" and "statutory policy" any less worthy of respect than similar promises found in so many other statutory regimes where we have said prospective waivers are impermissible. Certainly, one would think a criminal

defendant's right to appeal his sentence ranks at least as highly as, for instance, a right to nullify a contractual provision "'relieving [a] carrier . . . from liability'" for damage to the goods it transmits. *Vimar*, 515 U. S., at 534 (quoting 46 U. S. C. App. §1303(8) (1994 ed.)).

If a defendant may prospectively waive the right to appeal his sentence, too, one might wonder what's to stop prosecutors from pushing their luck further yet. Might we eventually face plea agreements that include prospective waivers of the defendant's right to complain about future unreasonable searches and seizures of his home? See L. Gill, Virginia Governor Vetoes a Ban on Plea Deals that Waive People's Constitutional Rights, Bolts (Apr. 14, 2026), https://perma.cc/3FL2-LBNB. Or prospective waivers of a defendant's right to seek a jury (rather than bench) trial in future proceedings if he ever is charged with another crime? See P. Hamburger, Purchasing Submission 165 (2021).[2]

---

[2] Two of my colleagues seek to bolster the government's defense of prospective appeal waivers. But respectfully, their offerings have problems too. After admitting that some rights cannot be prospectively waived, JUSTICE BARRETT fails to provide any reason why a criminal defendant's right to appeal an unconstitutional or unlawful sentence should not be among them. See *post*, at 2 (concurring opinion). Meanwhile, JUSTICE THOMAS seeks to distinguish between "procedural mechanism[s]," which he says can always be prospectively waived, and "substantive rights," which he agrees (sometimes) cannot. *Post*, at 8, n. 4 (dissenting opinion). But that distinction cannot explain our cases. *Morse* involved a procedural right—the right to remove a lawsuit to federal court—yet we held it insusceptible of prospective waiver. 20 Wall., at 452–458. And in *Alexander*, the plaintiff did not prospectively waive substantive protections against racial discrimination by his employer. See 415 U. S., at 39. Instead, he waived a procedural mechanism to vindicate those protections, agreeing to arbitrate future claims of racial discrimination rather than litigate them. See *id.*, at 40–42. Yet there too, this Court held the prospective waiver void. See *id.*, at 51–52; see also *Barrentine*, 450 U. S., at 730–733 (similar). Given precedents like these, it would seem to follow, *a fortiori*, that a waiver like Mr. Hunter's is also void, as it prospectively deprives a defendant of *any* forum (whether on direct appeal or through

Of course, none of these questions is before us in this case. All, however, may warrant exploration in future cases where they are presented, as may others besides. See, *e.g.*, *Melancon*, 972 F. 2d, at 577–579 (Parker, J., concurring specially) (discussing the potential application of the unconstitutional conditions doctrine); *United States* v. *Gordon*, 480 F. 3d 1205, 1207–1210 (CA10 2007) (applying contract principles to a plea bargain's terms); *United States* v. *Lajeunesse*, 85 F. 4th 679, 692 (CA2 2023) (same).

\*

Two hundred years ago, it was likely unimaginable that almost every federal criminal case would be resolved by plea bargain. Forty years ago, it may have been no easier to foresee that plea bargaining defendants would be pressed to waive their statutory right to appeal sentences yet to be imposed. Let alone that the federal government would argue these waivers prevent defendants from appealing even blatantly unlawful or unconstitutional sentences chosen by an orangutan. This Court is not responsible for all these developments, but it has encouraged some of them and stood silent while others took hold. Today, the Court finally begins to correct course, taking an important step toward reining in appeal waivers. It is not a solution to all of plea bargaining's excesses, and perhaps not even those associated with appeal waivers. But it is a start.

———————

collateral attack) to seek relief from an unconstitutional or unlawful sentence. See Pet. App. 6a; *Penn Plaza*, 556 U. S., at 269, 273 (holding an agreement to arbitrate ADEA claims generally enforceable in light of "[a]n arbitrator's capacity to resolve . . . discrimination claims brought under the ADEA," but conceding that such an agreement "will not be upheld" if a party could "block arbitration of [ADEA] claims"); *Mitsubishi Motors*, 473 U. S., at 636–637, and n. 19 (similar); *Vimar*, 515 U. S., at 539–541 (similar). Not only is JUSTICE THOMAS's account difficult to reconcile with our precedents. Under his view, it would seem the government could go so far as to insist that defendants prospectively waive the "procedural" right to a jury in any future trial against them.

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–1063

———————

## MUNSON P. HUNTER, III, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2026]

JUSTICE KAVANAUGH, with whom JUSTICE ALITO and JUSTICE BARRETT join, concurring.

I join the Court's opinion in full. The Court's opinion sets a "high bar" for the miscarriage-of-justice exception to render an appeal waiver unenforceable. *Ante*, at 11. The Court describes the exception as applying in "extreme cases" to sentencing errors that are "egregious" and "obvious" and that "undermine public confidence in the judiciary." *Ante*, at 11–12. I appreciate JUSTICE GORSUCH's thoughtful concurrence. But I respectfully disagree with his understanding of the miscarriage-of-justice exception. As I read it, his concurring opinion would set a lower bar for the miscarriage-of-justice exception than the Court's opinion does. In my view, therefore, the concurrence may not be entirely consistent with the Court's opinion. In any event, the Court's opinion of course speaks for itself.

# SUPREME COURT OF THE UNITED STATES

————

No. 24–1063

————

## MUNSON P. HUNTER, III, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2026]

JUSTICE BARRETT, concurring.

JUSTICE THOMAS raises some thoughtful points about the Supreme Court's supervisory power. See *post*, at 14–17 (dissenting opinion). Today's opinion nowhere mentions this power, however, and I do not understand the Court to implicitly assert it.

Like JUSTICE THOMAS, I am skeptical that the Supreme Court possesses an inherent, supervisory authority over inferior federal courts. See A. Barrett, The Supervisory Power of the Supreme Court, 106 Colum. L. Rev. 324 (2006). At the same time, I have distinguished exercises of such authority from the development of procedural common law. See A. Barrett, Procedural Common Law, 94 Va. L. Rev. 813, 883–884 (2008). The former concerns narrow, discretionary rules; the latter involves doctrines, like preclusion and abstention, which are "settled by tradition or emergent consensus." *Id.*, at 884.

In my view, today's decision rests on longstanding waiver principles and thus falls in the latter category. See *ante*, at 9 (majority opinion) (comparing appeal waivers to "waivers of other rights held by criminal defendants"). It is well established that a defendant may "intentional[ly] relinquis[h] or abando[n] . . . a known right." *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938); see *Shutte* v. *Thompson*, 15 Wall. 151, 159 (1873) ("[A] court whose province it is to

administer justice, will take care that on the trial of every
cause neither party shall reap any advantage from his own
fraud"). All the same, the Court and other authorities have
long recognized that a court should not enforce a waiver
when doing so would "irreparably discredi[t] the federal
courts." *United States* v. *Mezzanatto*, 513 U. S. 196, 204
(1995) (internal quotation marks omitted); see 1 J. Bishop,
Commentaries on the Law of Criminal Procedure §118,
p. 71 (2d ed. 1872) ("[T]hough the doctrine that a party may
waive a right which the law gives him seems to be univer-
sal, still it is not so in its practical workings"); R. Bowers,
Treatise on the Law of Waiver 390 (1914) (explaining that
there are some rights that a criminal defendant "cannot be
deprived of even with his own consent"). These established
waiver principles do not originate from the Court's supervi-
sory power. Rather, they belong to the body of procedural
common law doctrines that courts have long developed. See
Barrett, 94 Va. L. Rev., at 884.

The Court's decision recognizes these established princi-
ples and rightly endorses the "emerging consensus" that
they should inform the enforceability of appeal waivers.
*Id.*, at 886; see *ante*, at 4, and n. 1, 11. When the Govern-
ment moves to enforce an appeal waiver, it is asking the
court of appeals to hold a defendant to a position that he
knowingly and voluntarily took below. In the mine run of
cases, that waiver should be enforced: The right to appeal,
like most other rights, can be relinquished, either when the
appeal is ripe (by declining to file an appeal) or prospec-
tively (by signing an appeal waiver). But as the Court ex-
plains, there are some extreme cases where enforcing an
appeal waiver would paper over an "egregious" and "obvi-
ous" error that would "bring the judicial system into disre-
pute." *Ante*, at 11. In those rare circumstances, the appel-
late court should decline to enforce the waiver so that it may
correct the error.

# SUPREME COURT OF THE UNITED STATES

———

No. 24–1063

———

## MUNSON P. HUNTER, III, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 18, 2026]

JUSTICE THOMAS, dissenting.

Munson Hunter deceived others to make himself nearly half-a-million dollars. The Government charged him with 10 counts of fraud. If a jury had convicted him of all 10 counts, Hunter could have received a 300-year sentence. Instead, Hunter knowingly and voluntarily made an agreement with the Government. Under the agreement, the Government would dismiss nine counts. In exchange, Hunter would plead guilty to the remaining one and waive his right to appeal his sentence unless it exceeded the statutory maximum—a 30-year prison term followed by up to 5 years of supervised release. Thanks to the agreement, Hunter received a 51-month prison term, followed by three years of supervised release, less than 2% of the prison time to which the indictment exposed him. Now, Hunter wants to keep his reduced sentence but take back the appeal waiver, and the Court holds that he may be able to do so.

I see no basis for excusing Hunter from his appeal waiver. Defendants could not appeal federal criminal sentences at all for more than 100 years after the founding; only then did Congress create the statutory right to do so. "Like many constitutional and statutory rights, the right to appeal can be waived by the defendant, and once that choice is finally made, the defendant is bound by the decision." *Garza* v. *Idaho*, 586 U. S. 232, 257 (2019) (THOMAS, J., dissenting).

The Court today creates a "miscarriage-of-justice" exception to this rule. But, it cannot identify any source of law for its exception. Neither the contract-law principles that Hunter invoked nor this Court's supposed "supervisory power" give it the authority to override Hunter's appeal waiver.

Without any source of law to justify its decision, the Court appears to rest on its policy concern that holding defendants to their waivers may sometimes lead to unfair results or make federal courts look bad. But, policy concerns are not rules of decision in courts of law. Because I would decide Hunter's case based on law rather than policy, I respectfully dissent.

I

The Government charged Hunter with 10 counts of wire fraud, bank fraud, and conspiracy to commit wire and bank fraud. 18 U. S. C. §§1343, 1344, 1349. Each count carried a statutory maximum sentence of 30 years in prison. If the jury had convicted Hunter of all 10 counts, the District Court could have made the sentences run consecutively. See §3584(a).

The Government and Hunter reached a plea agreement. Hunter promised to plead guilty to one count of wire fraud. In exchange, the Government promised to dismiss the nine remaining counts. The agreement noted that Congress had authorized, as punishment for the one count that Hunter was pleading guilty to, a prison term of up to 30 years, so the deal reduced Hunter's statutory maximum sentence from 300 years to 30 years. The agreement also noted that the court could impose a term of supervised release, which "is a form of postconfinement monitoring that permits a defendant a kind of conditional liberty by allowing him to serve part of his sentence outside of prison." *Mont* v. *United States*, 587 U. S. 514, 523 (2019) (internal quotation marks omitted). One statutorily authorized condition for a term of

supervised release is the requirement that the defendant "undergo available medical, psychiatric, or psychological treatment." §3563(b)(9).

As part of the plea agreement, Hunter waived his right to appeal. The agreement confirmed that Hunter knew that he had a statutory right to appeal and that by signing the agreement he "knowingly and voluntarily waive[d]" that right. App. to Pet. for Cert. 6a. It stipulated that Hunter knew that this waiver was "made in exchange for the concessions made by the United States in this plea agreement." *Id.*, at 8a. It clarified that Hunter knew that the District Court "has authority to impose any sentence up to and including the statutory maximum set for the offense," and that "a sentence has not yet been determined by the Court." *Id.*, at 7a, 10a. And, it provided two exceptions: He could appeal to raise an ineffective-assistance-of-counsel claim or to challenge a sentence that exceeded the statutory maximum. *Id.*, at 5a–8a, 10a; see Brief for United States 30.

The District Court discussed the appeal waiver with Hunter, as required by the Federal Rules of Criminal Procedure. When the Federal Rules address appeal waivers, they merely require the District Court to inform the defendant of and ensure that the defendant "understands" the "terms of any plea-agreement provision waiving the right to appeal." Fed. Rule Crim. Proc. 11(b)(1)(N). The District Court carefully adhered to that requirement:

> "The Court: The maximum sentence that you face if you plead guilty is 30 years in prison. . . . Your term of supervised release will be subject to a number of conditions that will be monitored by a probation officer. . . . Do you understand that?
>
> "The Defendant: Yes, sir. . . .
>
> "The Court: If the sentence that I impose is greater than the sentence that you now expect or greater than the sentence that your lawyer or anyone else may have

predicted, you will be bound by your guilty plea today, regardless of your sentence. . . .  Do you understand that?

"The Defendant: Yes, Your Honor.

"[The Court:] Paragraph 5 says . . . '[d]efendant knowingly and voluntarily waives the right to appeal or collaterally attack the conviction and sentence except that the defendant does not waive the right to raise a claim of ineffective assistance of counsel.' . . .  "Have you discussed that provision with your lawyer?

"The Defendant: No. Well, I understand it, Your Honor.

"The Court: Well, let me just be sure.  You're going to be sentenced if I accept your guilty plea.  The most frequent basis for an appeal is complaining of this sentence.  It's very unlikely that you could appeal that under this waiver.  Basically you're agreeing to whatever sentence I impose.  Do you understand that?

"The Defendant: Yes, Your Honor."  App. 8–11 (paragraph breaks omitted).

   After the District Court accepted the agreement, the Probation Office recommended that the court require Hunter to undergo psychiatric treatment as a condition of his supervised release, due to his self-reported mental health problems.  At the sentencing hearing, Hunter objected to this recommendation.  The District Court responded that Hunter "should take" any drugs that his doctor may eventually prescribe, but it reassured Hunter that if he objected to any prescribed treatment, he could raise his concerns with his probation officer and then with the court.  App. to Pet. for Cert. 24a.[1]  Before Hunter could be sent to prison for violating his supervised-release conditions, the District

---

[1] By law, Hunter can move for modification of his supervised-release conditions "at any time."  18 U. S. C. §3583(e)(2).

Court would have to revoke the supervised-release term after separate proceedings. §3583(e)(3).[2]

The District Court sentenced Hunter to 51 months in prison and included as a condition of supervised release that Hunter "must take all mental health medications that are prescribed by [his] treating physician." *Id.*, at 35a.

Notwithstanding his appeal waiver, Hunter appealed his sentence. He argued that the mental-health supervised-release condition violates his substantive due-process rights under *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261 (1990). The Fifth Circuit dismissed Hunter's appeal because of the appeal waiver. At this time, there is no evidence that Hunter has been prescribed any medication to which he objects or that the District Court has had any reason to consider revocation proceedings. See Reply Brief 18.[3] The Court granted certiorari, 607 U. S. 961 (2025), and now announces a new rule, invalidating any appeal waiver that an appellate court concludes would result in a miscarriage of justice.

## II

For over 100 years after the founding, federal criminal defendants had no right to appeal their sentences.

———————

[2] Appeals of a district court's revocation of supervised release, courts have held, are not barred by a standard waiver of sentencing appeals in a plea agreement. See *United States* v. *Carruth*, 528 F. 3d 845, 846 (CA11 2008) (*per curiam*); *United States* v. *Lonjose*, 663 F. 3d 1292, 1299–1302 (CA10 2011); cf. *United States* v. *Scallon*, 683 F. 3d 680, 683–684, and n. 4 (CA5 2012) (*per curiam*) (reserving this question).

[3] Because Hunter cannot say whether he will ever be prescribed objected-to medication, he has conceded that his claim is not ripe under binding Fifth Circuit precedent. Brief for Appellant in No. 24–20211 (CA5), ECF Doc. 19, p. 15, n. 4 (citing *United States* v. *Ellis*, 720 F. 3d 220, 227 (2013) (*per curiam*), and *United States* v. *Carmichael*, 343 F. 3d 756, 761 (2003)). Hunter may well lack Article III standing under our precedents. See *Trump* v. *New York*, 592 U. S. 125, 131–132 (2020) (*per curiam*). The Court nonetheless proceeds to the merits without addressing its jurisdiction.

Although Congress has now authorized such appeals, defendants remain free to decline to exercise that statutory right or to affirmatively waive it, just like many other procedural rights.  Hunter's knowing and voluntary waiver of his statutory appeal rights in his valid plea agreement required dismissal of his appeal.

### A

Defendants may waive their right to appeal, and when they do so in valid plea agreements, those waivers must be enforced.

#### 1

Defendants can waive constitutional and statutory procedural rights.  "A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution."  *United States* v. *Mezzanatto*, 513 U. S. 196, 201 (1995).  They often waive such rights through plea agreements, which always entail waiving the constitutional rights to trial by jury, to confront one's accusers, and to avoid self-incrimination.  See *Boykin* v. *Alabama*, 395 U. S. 238, 243 (1969).  If defendants can waive constitutional procedural rights, it has long followed that the "same principle, *a fortiori*, applies to a mere statutory or common-law right."  1 J. Bishop, Commentaries on the Law of Criminal Procedure §118, p. 71 (2d ed. 1872) (Bishop); see also *People* v. *Rathbun,* 21 Wend. 509, 542 (N. Y. Sup. Ct. 1839) (noting that because the "prisoner may even waive his right to a trial," he also has the lesser power to "waive any matter of form or substance"); *Shutte* v. *Thompson*, 15 Wall. 151, 159 (1873) ("A party may waive any provision, either of a contract or of a statute, intended for his benefit"); *People* v. *Lightner*, 49 Cal. 226, 228 (1874) ("As a general rule a defendant may waive any statutory right or proceeding").

The right to appeal a sentence is a mere statutory right of modern origin. For much of American history, federal criminal defendants had no right to appeal at all. Trial-court judges have always been oath-bound to sentence defendants according to the law. But, for more than a century after the founding, when they made mistakes—even mistakes "apparent on the record"—federal defendants could not go to an appeals court "to revise the sentences of inferior courts in criminal cases." *Ex parte Watkins*, 7 Pet. 568, 574 (1833); see *United States* v. *Sanges*, 144 U. S. 310, 319 (1892) ("For a long time after the adoption of the Constitution, Congress made no provision for bringing any criminal case . . . by writ of error"). Then, as now, the Constitution provided no right to appeal. See *McKane* v. *Durston*, 153 U. S. 684, 687 (1894); *Jones* v. *Barnes*, 463 U. S. 745, 751 (1983). Even defendants sentenced to death could not appeal until 1889. It was thus "100 years before the defendant in a criminal case, even a capital case, was afforded appellate review as of right." *Carroll* v. *United States*, 354 U. S. 394, 400 (1957) (emphasis deleted). Only after that did Congress eventually give all federal defendants a right to appeal. *Abney* v. *United States*, 431 U. S. 651, 656, n. 3 (1977); *Carroll*, 354 U. S., at 400–401.

Congress has now provided defendants a path to seek appellate review of sentences if they so choose. A defendant "*may* file a notice of appeal." 18 U. S. C. §3742(a) (emphasis added); see also 28 U. S. C. §1291. But, the right to appeal "depends on assertion," so the defendant can "forfei[t]" his right to appeal by declining to file one or can waive it expressly. *United States* v. *Wegner*, 58 F. 3d 280, 282 (CA7 1995). Because a criminal defendant's right to appeal is "a mere statutory . . . right" that he is free to not invoke at all,

Bishop §118, he plainly "may waive" it, *Shutte*, 15 Wall., at 159.[4]

### 2

Waivers in plea agreements are strictly enforced. In *Santobello* v. *New York*, 404 U. S. 257 (1971), the State waived its right to make a sentencing recommendation as part of the defendant's guilty plea. *Id.*, at 258. But, the State recommended the statutory maximum at sentencing anyway, and the trial judge imposed the statutory maximum sentence. *Id.*, at 259–260. On appeal, this Court held that the defendant should either be free to "withdraw his plea of guilty" or be entitled to "specific performance of the agreement," meaning a new sentencing in which the State kept its promise. *Id.*, at 263. Likewise, in *Ricketts* v. *Adamson*, 483 U. S. 1 (1987), the defendant agreed to plead guilty to

—————

[4] To be sure, not all statutory rights can be waived. For instance, the "substantive right" under Title VII to be free from discrimination in the workplace "may not be prospectively waived." *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. 247, 265 (2009). But, deciding to resolve Title VII claims "by way of arbitration instead of litigation does not waive" the underlying substantive "right to be free from workplace . . . discrimination." *Ibid.* Such a decision "waives only the right to seek relief" in one forum as opposed to another. *Id.*, at 265–266.

An appeal waiver does not waive any substantive right, such as the right to be free from cruel or unusual punishment or to receive a sentence below some limit. It instead waives one procedural mechanism for seeking relief in which those underlying substantive rights can be "vindicat[ed]" in one particular forum. *Id.*, at 265. It thus resembles any number of procedural protections that parties routinely waive in litigation. See, *e.g.*, *United States* v. *Mezzanatto*, 513 U. S. 196, 202–203 (1995) (Federal Rules of Evidence); *id.*, at 201–202 (Federal Rules of Criminal Procedure); *Mallory* v. *Norfolk Southern R. Co.*, 600 U. S. 122, 144, and n. 10 (2023) (plurality opinion) (personal jurisdiction); *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 640 (1985) (holding that agreement to arbitrate is enforceable); *The Bremen* v. *Zapata Off-Shore Co.*, 407 U. S. 1, 15 (1972) (holding that forum-selection clause is enforceable).

second-degree murder and testify against his co-conspirators in exchange for the State's promise to drop a first-degree murder charge. *Id.*, at 3. The defendant was sentenced for second-degree murder. *Id.*, at 4. During the retrial for his co-conspirator, the Court held, the defendant faced a "choice": "He could submit to the State's request that he testify at the retrial . . . or . . . his breach of the agreement would restore the parties to their original positions and he could be prosecuted for first-degree murder." *Id.*, at 11. The defendant decided not to testify, and he was prosecuted and convicted for first-degree murder. The Court upheld this conviction, concluding that the State could "enforce the agreement." *Id.*, at 12.

Accordingly, when defendants waive their statutory appeal rights in plea agreements, those waivers are enforceable. Given that defendants can waive constitutional rights gratuitously, they can certainly waive statutory rights in exchange for enforceable benefits in plea agreements—such as the sentencing recommendation in *Santobello.* And, if defendants are bound by gratuitous waivers, they can also be held to ones from which they benefited—such as the promise to testify in *Ricketts.* Bargained-for waivers of statutory rights thus not only are valid; they must be enforced to ensure that both sides to the agreement receive what they bargained for.[5] A defendant who waives his statutory appeal right in a plea agreement is therefore "bound by the decision." *Garza*, 586 U. S., at 257 (THOMAS, J., dissenting).

The defendant remains bound even though he cannot know exactly what his sentence will be when he signs his waiver. When the defendant knowingly agrees to waive his appeal right, his waiver is knowing precisely because he is made aware of the uncertainty. See Fed. Rule Crim. Proc.

---

[5] Because plea agreements involve an exchange of promises, this Court has often analogized plea agreements to contracts. See, *e.g.*, *Puckett* v. *United States*, 556 U. S. 129, 137 (2009).

11(b)(1) (requiring the court to ensure the defendant "understands" the appeal waiver and the variability of the possible sentence). Many other waivers entail similar uncertainties. For instance, every plea agreement waives the right to trial. And, defendants remain bound by their plea even when later developments could lead them to regret their waiver in retrospect. See *Brady* v. *United States*, 397 U. S. 742, 756–757 (1970) (holding that guilty pleas are enforceable even after a favorable change in law); *United States* v. *Ruiz*, 536 U. S. 622, 629–630 (2002) (holding that guilty pleas are enforceable even after it is discovered that the Government withheld impeachment evidence); *Tollett* v. *Henderson*, 411 U. S. 258, 266–267 (1973) (holding that guilty pleas are enforceable even after it is discovered that the defendant would have had a claim based on an unconstitutionally selected grand jury).

At every stage, defendants waive rights despite uncertainty about the consequences. A defendant of course "may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide." *Ruiz*, 536 U. S., at 629–630. A defendant has long been able to waive a wide range of procedural rights, such as the right to an arraignment or the right to object to jurors or the right to challenge the constitutionality of the grand jury, "no matter how much this may subsequently prejudice him." F. Wharton, Criminal Pleading and Practice §733, p. 504 (9th ed. 1889).

## B

These well-established principles required dismissal of Hunter's appeal. Hunter knowingly and voluntarily entered into his plea agreement, which contained an express appeal waiver. The text of the appeal waiver barred all sentencing appeals. It included two exceptions that, all agree,

are not implicated here. The District Court carefully ensured that Hunter had full awareness of the appeal waiver's consequences. Hunter stood in open court, was asked by a judge whether he understood that he was "waiving or giving up [his] right to appeal," and answered "Yes, Your Honor." App. 12. Further, the plea agreement rested on mutually beneficial promises from both Hunter and the Government: Hunter would plead guilty and would not appeal except in limited circumstances, and the Government would dismiss nine counts and reduce Hunter's maximum sentencing exposure by 270 years. The Government then upheld its end of the bargain.

If Hunter wants to retain the significant benefits he received through his plea agreement, he cannot renege on the agreement now.[6] Hunter waived his right to appeal, and his claim is covered by his appeal waiver, which he knowingly and voluntarily agreed to as part of an enforceable plea agreement. See *Garza*, 586 U. S., at 251 (THOMAS, J., dissenting). It is irrelevant that he may not have expected one particular supervised-release condition when he signed the agreement.[7]

_____

[6] Hunter may well come to regret seeking to appeal his sentence after a favorable deal. As both counsel conceded and the Court does not dispute, the Government can generally seek to void plea agreements in their entirety after defendants breach appeal waivers, which may enable the Government to allege a breach and seek convictions on the dropped counts. Tr. of Oral Arg. 6–7, 60–61; see also App. to Pet. for Cert. 7a.

[7] In any event, Hunter should not have been surprised by the mental-health-treatment supervised-release condition that he now challenges. While his appeal was pending, Hunter filed a separate motion to vacate his sentence, claiming that his "history of autism and cognitive disorders called into question the validity of his guilty plea." No. 4:23–cr–00085 (SD Tex.), ECF Doc. 179, p. 5. Hunter described himself as a "severely impaired individual" and noted that it had been "extensively shown" throughout the litigation that he had mental health problems. *Id.*, at 13–14.

### III

The Court does not dispute these principles; it just creates an exception to them. Although Hunter's briefing in this Court primarily argued that various contract-law principles excused him from his waiver, the Court wisely does not endorse that theory; it does not even mention it.[8] Instead of importing contract-law defenses, the Court creates a free-floating "miscarriage-of-justice" exception, which permits appeals despite valid appeal waivers when any of at least four different factual scenarios arise at sentencing. *Ante,* at 12–13.

The Court, however, fails to identify any basis in law for its exception. It identifies no constitutional text, statute, or Federal Rule of Criminal Procedure that even suggests its miscarriage-of-justice exception. And, it identifies no established common-law or equitable doctrine that resembles it. The Court instead grounds its exception in the need to avoid "bring[ing] the judicial system into disrepute." *Ante*, at 1, 11. Because federal courts have a "role . . . in approving and implementing appeal waivers," the Court argues, this Court must create appropriate rules for enforcing them,

---

[8] Hunter argued that a plea agreement is a contract and that an amalgamation of various contract-law doctrines—including voidness for public policy, unconscionability, frustration of purpose, and the implied duty of good faith—made his appeal waiver an unenforceable contract. See Brief for Petitioner 9–34; Tr. of Oral Arg. 46 (noting that Hunter went "all in on this contract thing"). Hunter claims that the "best" contract-law principle going for him "is frustration of purpose." Tr. of Oral Arg. 13. But, the frustration-of-purpose doctrine requires that postagreement developments render the contract "virtually worthless" before they void a contract. Restatement (Second) of Contracts §265, Comment *a* (1979). The plea agreement was not rendered worthless when the District Court included a mental-health treatment supervised-release condition. The plea agreement still achieved a crucial purpose for Hunter—it reduced his maximum exposure from 10 counts and 300 years to 1 count and 30 years. Hunter's other contract-law arguments are further afield, and it is also unclear what role contract law could even play when the defendant has also waived the right in court.

which should advance the court system's own "'institutional interest.'" *Ante*, at 8–9. [9]

Of course, the Court's desire for a particular legal rule does not give it the right to create it. "Our duty is to apply the law, not to make it." *Pine Grove* v. *Talcott*, 19 Wall. 666, 677 (1874). Thus, concerns about public perception of the judiciary provide no justification for the Court's decision. The power to change the law to avoid outcomes that the people do not like "lies with the people, and not with the judiciary." *Ibid.*

————————

[9] The Court does not claim that any traditional common-law doctrine supports its miscarriage-of-justice exception. Instead, it recognizes itself as creating a new rule based on its authority over the lower courts that administer plea agreements and its policy and institutional concerns. *Ante*, at 8–13 (majority opinion).

JUSTICE BARRETT, for her part, adopts a sounder methodology. See *ante*, at 1 (concurring opinion). But, in my view, the common-law-of-waiver principles she invokes cannot justify this decision either for several reasons. First, if today's decision could be justified as an act of common-law finding rather than policymaking, one would expect to find a more robust tradition of decisions applying a similar rule in similar situations. Yet, neither JUSTICE BARRETT nor the Court can point to any. See *infra*, at 22–23. Second, JUSTICE BARRETT cites authorities explaining that certain rights may never be waived. *Ante*, at 2; see *infra*, at 22. That general principle is true as far as it goes. But, common-law doctrines require rules with identifiable content for judges to apply, not only general principles. It is not entirely clear how the general principle that some rights cannot be waived leads to the Court's granular rule under which appeals can be waived, but those waivers become void if any of four specific factual scenarios later occur at sentencing. Third, this body of law precluded waivers of certain procedures that implicated the "substantial" features "of the legal tribunal" or the "fundamental mode of its proceeding." R. Bowers, Law of Waiver §397, p. 394 (1914). It is not clear to me that appeals of sentencing errors—appeals that did not even exist until 100 years after the founding and that must be asserted by the defendant—are sufficiently fundamental to criminal procedure for these doctrines to have any purchase. In any event, Hunter never developed an argument along these lines, which may explain why the Court, on my reading, declined to adopt it.

To the extent that one can infer any source of law from the Court's opinion, it appears to be its so-called supervisory power over lower federal courts. See Tr. of Oral Arg. 97–99, 116–118. The Court's reasoning today is reminiscent of its precedents purporting to exercise that power. Like the Court's decision today, see *ante,* at 10–12, these supervisory-power decisions have justified themselves based on general "considerations of justice not limited to the strict canons" of law. *McNabb* v. *United States*, 318 U. S. 332, 341 (1943). And, like the Court's decision today, see *ante,* at 1, 9–11, prior supervisory-power decisions have justified themselves based on "public perception of the integrity" of the courts. *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 811 (1987) (plurality opinion). Thus, though the Court conspicuously avoids mentioning its name, the supervisory power appears to be the only conceivable source of authority for the Court's decision.

The supervisory power of the Supreme Court, however, cannot justify the Court's miscarriage-of-justice exception for four reasons. First, it is doubtful that the power exists. Second, even if it did, it still would not extend to vitiating provisions in valid plea agreements, as the Court's rule effectively does. Third, the congressionally authorized rule-making process has addressed appeal waivers, so this Court should not circumvent that process. Finally, the two precedents that the Court relies on as justifying a miscarriage-of-justice exception do no such thing. In the end, the Court has nothing but policy arguments, but even there, its analysis is unpersuasive.

A

The Court has never identified a source for its alleged general supervisory power to dictate to lower courts procedural rules not required by the Constitution, Congress, or the Federal Rules. Cf. *United States* v. *Tsarnaev*, 595 U. S. 302, 315, and n. 1 (2022). Like Justice Scalia, "I do not see

the basis for any direct authority to supervise lower courts."
*Bank of Nova Scotia* v. *United States*, 487 U. S. 250, 264
(1988) (concurring opinion); see also *Western Pacific R.
Corp.* v. *Western Pacific R. Co.*, 345 U. S. 247, 273 (1953)
(Jackson, J., dissenting) (describing "this Court's exercise of
its vague supervisory powers over federal courts"). Instead,
"the Constitution's structure cuts against, and history rules
out, the proposition that the Supreme Court possesses in-
herent supervisory power over inferior court procedure." A.
Barrett, The Supervisory Power of the Supreme Court, 106
Colum. L. Rev. 324, 387 (2006).

The Court "has been remarkably vague about the source
of its supervisory authority." *Id.*, at 333. The Court's first
exercise of this power came in *McNabb* v. *United States*, 318
U. S. 332 (1943). That decision asserted that this Court can
"formulat[e]" rules for lower courts based on "considera-
tions of justice not limited to the strict canons" of the law.
*Id.*, at 341. This new assertion of power looked nothing like
traditional, unwritten procedural law, in which judges
merely applied rules whose content had long been settled
by common-law authorities. Instead, when the Court exer-
cised this new supervisory power, it "self-consciously for-
mulate[d] its own standard." Barrett, 106 Colum. L. Rev.,
at 376.[10] As legal justification for this novel approach, the

_____

[10] The supervisory power is thus distinct from two legitimate traditions
of unwritten procedural law, neither of which provide any support for the
Court's holding today. First, the Court has recognized that courts have
"'inherent'" and "ancient" authority to manage their own courtroom and
enforce their orders. *Link* v. *Wabash R. Co.*, 370 U. S. 626, 630 (1962).
For example, courts in some circumstances have inherent authority to
sanction parties, *ibid.*, or to stay proceedings, *Landis* v. *North American
Co.*, 299 U. S. 248, 254 (1936). Second, courts can enforce general com-
mon-law or equitable procedural rules with an "identifiable content . . .
settled by tradition or emergent consensus." A. Barrett, Procedural Com-
mon Law, 94 Va. L. Rev. 813, 884 (2008). For example, doctrines of pre-
clusion may derive from longstanding common-law principles. See *ibid.*

*McNabb* Court provided an analysis-free string cite of prior
decisions, but none of them provided for anything like the
modern supervisory power.  R. Pushaw, The Inherent Pow-
ers of Federal Courts and the Structural Constitution, 86
Iowa L. Rev. 735, 780–781, and n. 242 (2001) (analyzing the
cited cases); see *McNabb*, 318 U. S., at 341.  In short, the
supervisory power had a late and unconvincing start.

The supervisory power's only "arguable basis" in the Con-
stitution's text comes from its "establishment of this Court
as 'supreme,' as distinct from the 'inferior Courts' that Con-
gress has discretion to create."  *Tsarnaev*, 595 U. S., at 326
(BARRETT, J., concurring).  But, that aspect of Article III's
structure does not justify a general supervisory power.
That this Court is in some respects "supreme" over other
federal courts—we review their judgments—does not re-
motely entail "that the Constitution requires across-the-
board subordination of inferior courts" to the Supreme
Court.  Barrett, 106 Colum. L. Rev., at 365.  Instead, any
"viable claim to supervisory authority" over an area of law
must be "rooted in history."  *Id*., at 366.

History does not suggest that the Supreme Court has in-
herent authority to create new procedural rules for lower
federal courts, either.  At the founding, consistent practice
revealed "that the framers viewed the establishment of
rules of procedure as a legislative function" that was some-
times explicitly "delegated by Congress to the courts."  S.
Beale, Reconsidering Supervisory Power in Criminal Cases:
Constitutional and Statutory Limits on the Authority of the
Federal Courts, 84 Colum. L. Rev. 1433, 1467 (1984); cf. 3
J. Story, Commentaries on the Constitution of the United
States §§1752, 1768 (1833) (explaining that "it is for con-
gress alone to furnish the rules of proceeding, to direct the

––––––––––

The Court makes no claim that its miscarriage-of-justice exception is
necessary for managing its own courtroom or has been derived from any
established common-law doctrine.

process, to declare the nature and effect of the process,"
while courts have "incidental powers" to regulate only in-
ternal matters, such as their "own officers" and disruptions
to the judicial process).  Early Congresses prescribed many
procedural rules for federal courts, required them to follow
state law on other procedural matters, and often delegated
to the Supreme Court the authority to formally promulgate
additional procedural rules.  W. Baude, J. Goldsmith, J.
Manning, J. Pfander, & A. Tyler, Hart and Wechsler's The
Federal Courts and the Federal System 727–733 (8th ed.
2025); *Wayman* v. *Southard*, 10 Wheat. 1, 22–23, 42–45
(1825); Judiciary Act of 1789, 1 Stat. 81–90; Process Act of
1789, ch. 21, 1 Stat. 94; Process Act of 1792, 1 Stat. 276.  It
was "not until the twentieth century" that this Court
"claimed the right to prescribe procedure for inferior federal
courts" while deciding cases and controversies—instead of
acting under a delegated rulemaking authority.  Barrett,
106 Colum. L. Rev., at 387.  History thus provides no sup-
port for the Court's inherent supervisory authority to create
a new rule invalidating appeal waivers.[11]

## B

Even if this Court had a general supervisory power, it
could not justify the Court's new miscarriage-of-justice

---

[11] The Rules Enabling Act has further undermined any argument for
the supervisory power.  The Act expressly delegates rulemaking power
to the Supreme Court subject to a comprehensive process for exercising
it, complete with the creation of Rules Committees to consider and de-
velop new rules in a particular way. 28 U. S. C. §2073.  Even if the Court
had inherent authority to supervise lower courts in the absence of Con-
gressional action, it "may well be that the detailed scheme of supervisory
rulemaking prescribed by the Rules Enabling Act extinguishes the
Court's ability to act outside that process."  A. Barrett, The Supervisory
Power of the Supreme Court, 106 Colum. L. Rev. 324, 387 (2006); see
*Mohawk Industries, Inc.* v. *Carpenter*, 558 U. S. 100, 115 (2009) (THOMAS,
J., concurring in part and concurring in judgment) (explaining that Con-
gress "'designat[ed] rulemaking, "not expansion by court decision," as
the preferred means of determining'" judicial procedures).

exception to appeal waivers. The supervisory power "deal[s] strictly with the courts' power to control their *own* procedures," but does not authorize setting substantive standards. *United States* v. *Williams*, 504 U. S. 36, 45–47 (1992). When it has been invoked, it has had the more limited scope of protecting judicial "proceedings," *Degen* v. *United States*, 517 U. S. 820, 823 (1996), through "rules of evidence and procedure that are binding" in lower courts, *Dickerson* v. *United States*, 530 U. S. 428, 437 (2000). The typical supervisory power cases thus govern issues related to trial administration, such as jury selection rules and processes, *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 225 (1946); *Rosales-Lopez* v. *United States*, 451 U. S. 182, 192 (1981) (plurality opinion), warnings to *pro se* litigants of the consequences of their actions, *Castro* v. *United States*, 540 U. S. 375, 382–383 (2003), the introduction of certain tainted evidence, *McNabb*, 318 U. S., at 345, or the appointment of a prosecutor in contempt proceedings, *Young*, 481 U. S., at 808–809. Likewise, when addressing appellate courts, the supervisory power has been used to require clear explanations to litigants of en banc rehearing procedures. *Western Pacific R. Corp.*, 345 U. S., at 267–268.

The Court's decision today exercises a different kind of power. Hunter maintains that his plea agreement is a binding contract, and the appeal waiver it includes is generally enforceable as a matter of contract law. See Brief for Petitioner 2, 32; Tr. of Oral Arg. 44. In ruling for him, the Court therefore appears to empower lower courts to rewrite an otherwise binding agreement made by two parties. The parties agreed to permit appeals only for sentences that exceed the statutory maximum or that were tainted by ineffective assistance of counsel. Now, the Court has revised that contract and the waiver so that the defendant can also appeal a sentence after a miscarriage of justice. The power to supervise the federal courts' own internal processes cannot justify such an act.

The Court tries to solve this problem through an indirect chain of reasoning. Plea agreements are approved by district courts, and the process by which they do so, the Court says, involves a measure of discretion. *Ante*, at 8–9. Thus, the Court continues, the question whether to enforce an appeal waiver in a plea agreement, once under consideration in the court of appeals, is linked to the district court's initial discretionary process to approve the agreement itself. *Ante*, at 9. So, the Court seems to think, it follows that the Supreme Court has inherent supervisory power to prescribe rules for enforcing appeal waivers in the courts of appeals, flowing from its ability to supervise that initial plea agreement approval process in the district courts.

That logic overlooks what is at issue here. The Court's supervisory authority may have been understood to reach the judicial procedure for accepting the plea agreement itself, see *McCarthy* v. *United States*, 394 U. S. 459, 464 (1969), but it does not follow that it includes the power to change the substantive provisions of valid plea agreements once they have been approved and made binding. This case illustrates the problem: Hunter is not challenging anything related to the District Court's approval of his plea agreement. To the contrary, he seems to hope that the agreement is still binding, as he suggests that he would resist any effort by the Government to reinstate the nine counts it dropped. See Tr. of Oral Arg. 6–7. He instead simply wants the agreement changed by the Court of Appeals to permit his appeal. But, the supervisory power does not permit either rewriting the parties' contract or changing plea-bargaining law. [12]

_____

[12] The Court cannot escape this problem by framing its rule as addressing the enforceability of the agreement. Generally, the question "whether a particular agreement is enforceable" has been understood as "one of substance, not procedure." *Bassidiji* v. *Goe*, 413 F. 3d 928, 936 (CA9 2005); *MediaNews Group, Inc.* v. *McCarthey*, 494 F. 3d 1254, 1260

### C

Even if the Court could recharacterize its rule as procedural, it was not the Court's place to promulgate it. The committee responsible for developing the Federal Rules of Criminal Procedure has declined to advance a rule like this one, and Congress established that rulemaking process to evaluate the costs and benefits of various policy proposals.

"Whatever the scope" of this Court's supervisory power, it does not include "the power to . . . circumvent" the Federal Rules of Criminal Procedure. *Carlisle* v. *United States*, 517 U. S. 416, 426 (1996); see *Tsarnaev*, 595 U. S., at 315–316. The Rules Enabling Act establishes a reticulated process for this Court to alter lower courts' procedures. In this process, the Judicial Conference's Rules Committees recommend Rules of practice, procedure, and evidence after an extensive public process, 28 U. S. C. §2073, so that the Rules "dra[w] on the collective experience of bench and bar," *Mohawk Industries, Inc.* v. *Carpenter*, 558 U. S. 100, 114 (2009). Then, before the Supreme Court adopts the recommendations as binding rules, it must first transmit them to Congress. §2074. Because this process enables "thorough" consideration of the policy issues, this Court is ill equipped to second-guess those policy judgments while it is merely hearing one case. *Shannon* v. *United States*, 512 U. S. 573, 587 (1994) (describing statutes). Recent involvement by the Rules Committee on an issue therefore "counsels hesitation in invoking our supervisory powers." *Ibid.*

The Rules Committee has recently addressed appeal waivers. In fact, it has paid close attention to them, advanced rules in this area, and declined to adopt a rule like

_____

(CA10 2007) (similar); cf. *Perry* v. *Thomas*, 482 U. S. 483, 492–493, n. 9 (1987) (noting that validity, revocability, and enforceability of contracts are generally state-law questions in federal court); *Chalk* v. *T–Mobile USA, Inc.*, 560 F. 3d 1087, 1092 (CA9 2009) (holding that "unconscionability" is a state-law question); *Hines* v. *National Entertainment Group, LLC*, 140 F. 4th 322, 327–328 (CA6 2025) (similar).

the Court's. In 1996, the Rules Committee proposed what is now Federal Rule of Criminal Procedure 11(b)(1)(N), which requires district courts to explain appeal waivers to the defendant before accepting a plea agreement containing one. See N. King & M. O'Neill, Appeal Waivers and the Future of Sentencing Policy, 55 Duke L. J. 209, 222 (2005). Some immediately objected that such a rule would imply general acceptance of appeal waivers, which they opposed because of the risk that significant trial-judge errors would be shielded from review. *Id.*, at 222–223. The Rules Committee approved the recommendation anyway, which this Court accepted and Congress allowed. Appeal waivers, now seemingly approved of by the Federal Rules, continued to become more prevalent. *Id.*, at 224.[13] The Rules Committee has remained focused on appeal waivers in the years since. In 2015, the Committee heard a proposal to prevent courts from accepting appeal waivers before sentencing. Advisory Committee on Criminal Rules, Draft Minutes, pp. 37–38 (Mar. 16–17, 2015). But, the Committee unanimously agreed not to pursue it. *Ibid.* And, at the meeting earlier this year, a member proposed requiring further disclosure to defendants about the consequences of appeal waivers. Advisory Committee on Criminal Rules, Minutes, pp. 71–72, (Jan. 6, 2026) (noting it was taken under advisement). But, even after hearing such proposals, the Rules Committee has not advanced any recommendation to preclude defendants from waiving certain appeals.

By effectively legislating a new rule in this area, the Court intrudes on the calibrated policymaking process established by the Rules Enabling Act. The Rules Committee stands equipped to weigh policy tradeoffs, collect data, engage in a "thorough and exhaustive review" of the issue, and

---

[13] Although the Advisory Committee said that it was not taking a position on the validity of appeal waivers, the new Rule in practice "solidified" them. K. Bennardo, Post-Sentencing Appellate Waivers, 48 U. Mich. J. L. Reform 347, 358–359, n. 59 (2015).

craft a rule that achieves fairness for all parties. *Shannon*, 512 U. S., at 587. Therefore, this Court should have "hesitat[ed]" before creating a new rule that the Rules Committee "could have included" in its deliberations on appeal waivers, but ultimately "chose not to." *Ibid.*

D

Finally, the sparse precedents that the Court relies on do not justify its miscarriage-of-justice exception. See *ante,* at 9–10.

In *Mezzanatto*, 513 U. S. 196, a defendant sought to be excused from his waiver of certain evidentiary protections. The District Court held him to his waiver. The defendant was convicted, and on appeal, this Court upheld the conviction and the enforcement of the waiver. *Id.*, at 199, 210–211. *Mezzanatto*'s holding, then, provides no support for the Court's exception that it creates today. In fact, *Mezzanatto*'s reasoning emphasized that "we have presumed that statutory provisions are subject to waiver," and that waivers of evidentiary protections are "'liberally enforced.'" *Id.*, at 201, 202. So, the Court today must turn to a single paragraph of dicta in *Mezzanatto*, which suggested that "[t]here may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived," before concluding that no such provision was implicated. *Id.*, at 204. In its decision today, however, the Court makes clear that it does not believe that the right to appeal a sentence is so fundamental that it "may never be waived." See *ante,* at 11–13. The Court instead confirms that the right to appeal almost always can be waived, but the waiver becomes unenforceable in the rare circumstance of a miscarriage of justice. Because *Mezzanatto*'s dicta addresses only protections that can never be waived, it cannot support the Court's rule.

In *Wheat* v. *United States*, 486 U. S. 153 (1988), this Court declined to enforce a different kind of waiver, but it

did so based on a requirement in the Federal Rules. There, a defendant sought to retain counsel who was currently representing his co-conspirators. The Government objected to the joint representation due to the risk of a conflict of interest. Brief for United States in *Wheat* v. *United States*, O. T. 1987, No. 87–4, pp. 3, 7. The defendant waived his right to a conflict-free counsel. The District Court refused to accept the waiver and rejected the defendant's choice of counsel. This Court affirmed. Central to its reasoning, the Court explained that "the Federal Rules of Criminal Procedure direct trial judges to investigate specially" cases with joint representations that may create conflicts of interest "'to protect each defendant's right to counsel.'" *Wheat*, 486 U. S., at 161 (quoting Fed. Rule Crim. Proc. 44(c)). The Notes of the Advisory Committee even suggested that a district court could order that defendants be separately represented. 486 U. S., at 161. So, the Court affirmed a District Court for doing what the Federal Rules called for. But, here, the Court remands for evaluation of whether enforcement of a waiver will result in a miscarriage of justice, even though the Federal Rules say nothing about miscarriages of justice.

### E

Without any legal justification for its rule, the Court appeals primarily to the policy instinct that unfairness could result from its farfetched hypotheticals. Surely, the Court reasons, a defendant must be able to appeal a sentence selected by an orangutan. *Ante*, at 10–11. I disagree with any insinuation that the only thing stopping federal judges from violating their oaths is the possibility of a sentencing appeal. I also disagree with the assumption that the problem of possibly erroneous trial courts can only be solved by possibly erroneous appellate judges. The Government even notes that it can decline to enforce waivers if an egregious injustice occurs. Brief for United States 31. There were no

criminal appeals for over 100 years of American history, and our legal system did not descend into chaos.

Moreover, the Court's policy reasoning overlooks important drawbacks to its approach. For one thing, it is not obvious that this rule will provide fairness to defendants. After all, "in the long term," uncertainty about whether an appeal waiver will be enforced "eliminate[s] a bargaining tool to convince the government to drop pending charges." *Portis* v. *United States*, 33 F. 4th 331, 336 (CA6 2022). Defendants like Hunter, therefore, may have to forgo other valuable consideration to obtain similarly lenient sentences. A "sounder" approach is "to permit the interested parties to enter into knowing and voluntary negotiations without any arbitrary limits on their bargaining chips." *Mezzanatto*, 513 U. S., at 208. For another, the Court's approach may lead to a flood of new meritless sentencing appeals. One study concluded that, as of 2003, 65% of plea agreements in federal cases contained appeal waivers. King, 55 Duke L. J., at 231. Of agreements with a waiver, 80% waived both direct appeals and collateral attacks under §2255. *Id.*, at 243. If these numbers have remained steady over the two decades since—and I have no reason to doubt it—the consequences of today's decision for the federal courts of appeals are sobering. Last year, over 76,000 defendants pleaded guilty. Admin. Office of the U. S. Courts, U. S. District Courts–Criminal Statistical Tables for the Fed. Judiciary (2026) (Table D–4). Over the last 10 years, more than 680,000 defendants have pleaded guilty.[14] Between defendants who can appeal and prisoners who can collaterally attack already-final sentences, it is not hard to imagine a hundred thousand claims that should be barred by waivers that will now be filed in reliance on the Court's exception. The Court's efforts to keep this exception narrow

―――――――――
[14] Admin. Office of the U. S. Courts, U. S. District Courts–Criminal Statistical Tables for the Fed. Judiciary (2015–2025) (Table D–4).

may make it hard to succeed on these claims, accord, *ante,* at 1 (KAVANAUGH, J., concurring), but a miscarriage of justice will always be easy to allege.  The courts of appeals will now have to sift through many appeals even though miscarriages of justice are, as the Court admits, "rare."  *Ante,* at 13 (majority opinion).

Ultimately, though, how I weigh the tradeoffs between the risk of a rogue district court judge issuing a lawless sentence, the diminished utility of the appeal-waiver bargaining chip, and the potential flood of new appeals should not matter.  In the absence of a legal principle saying otherwise, Hunter's plea agreement and appeal waiver are valid and should be enforced.

## IV

Hunter knowingly and voluntarily agreed to waive his appeal rights, and the exceptions he preserved are not implicated here.  Accordingly, I would enforce his agreement and dismiss his appeal.  I respectfully dissent.